**STATE of Minnesota, Respondent,**

v.

**Zachary Aaron ROAN, Appellant.**

**No. C5–94–599.**

Supreme Court of Minnesota.

June 9, 1995.

---

Michael C. Davis, Sp. Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Paul R. Scoggin, Asst. County Atty., Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

Following a jury trial, appellant Zachary Aaron Roan was convicted of two counts of first-degree murder in violation of Minn.Stat. § 609.185(3) (1994) and Minn.Stat. § 609.05 (1994) in connection with a double homicide that occurred at Lloyd's Gun Shop in North Minneapolis. Appellant was sentenced to two consecutive terms of life imprisonment. He now appeals from the judgment of conviction and sentencing.

On the evening of June 23, 1992, Tim Foslien and Brian Maas were fatally shot during a robbery at Lloyd's Gun Shop, in North Minneapolis. An autopsy revealed that Brian Maas was shot three times; two of his wounds were fatal. Tim Foslien was shot once in the right eye. Upon investigation of the crime scene, police recovered four .380 caliber shell casings. Police also recovered two pieces of poster board with a partial shoe print, as well as a shoe print on the store counter. Approximately 93 guns were stolen from the store including semi-automatic handguns, revolvers, rifles, shotguns, and stun guns.

At approximately 9:00 p.m. that night, appellant and Benjamin Logan arrived at the Mankato apartment Betty Cole shared with Darren Hardaway. Cole testified that Logan told them he and appellant had each shot a man. When Cole turned to appellant for confirmation of Logan's story, appellant allegedly silently gestured "like a gun to the head." Cole testified further that Hardaway and Logan then brought a cardboard box into the apartment containing "about a 100" guns. Around midnight that night, Cole and Hardaway drove to Chicago, followed by appellant and Logan, who were driving a beige Mercury Cougar.

On June 25, 1992, three Chicago police officers observed Hardaway get out of a Mercury Cougar near a public telephone wearing a visible gun. Appellant was in the passenger seat and Logan was in the driver's seat. Police stopped the men, finding a loaded 9mm Glock handgun on appellant and a loaded .40 caliber semi-automatic Glock handgun on Logan. The officers arrested the three men for misdemeanor handgun possession. Upon searching the car, police found a number of additional guns and a key from the Presidential Hotel, room 123. All three men were advised of their *Miranda* rights and taken into custody.

Because of the number of guns seized, Chicago police contacted the Bureau of Alcohol, Tobacco and Firearms (BATF). After checking the guns' serial numbers on a national computer system, Chicago police learned that some of the guns were stolen during the double homicide in Minneapolis. Chicago police then contacted the Minneapolis Police Department, and Officers Morrill and DeConcini of the Minneapolis Police Department flew to Chicago the morning of June 26, 1992.

On June 26, 1992, the Lyons, Illinois Police Department independently learned that a maid had found a gun in room 123 of the Presidential Hotel. Police searched the room with the hotel owner's consent, recovering several items including a receipt from Carl's Gun Shop in Mankato in appellant's name, undeveloped photo negatives which later revealed photographs of appellant posing with a gun pointed at the camera, a stun gun, and a chrome Davis Industries P–380 handgun. Police also seized several pair of shoes. One of the shoes seized matched the tread

pattern of the footprint recovered at the crime scene, although police could not determine the size or design of the shoe that made the print.

Further investigation revealed that three of the shell casings recovered from Lloyd's Gun Shop were fired from the chrome Davis Industries P–380 gun seized from the hotel room, including the cartridge that killed Foslien, and two of the cartridges fired into Maas. The fourth shell casing could not be matched with a particular gun.

Under questioning, Darren Hardaway directed officers to Kelvin McCollum's home in Chicago where appellant allegedly slept the night of June 24, 1992. The police recovered another 18 guns, including three from the Lloyd's Gun Shop robbery, a grinder to remove serial numbers from guns, drug paraphanalia, and $12,000 in cash.

A BATF agent questioned appellant on June 25, 1992, before BATF learned of the connection with the Minneapolis murders. Minneapolis Police Officer DeConcini interviewed appellant at approximately 2:30 p.m. on June 26, 1992. At that time, appellant declined to discuss the matter with DeConcini. DeConcini interviewed appellant again shortly after midnight on June 27, 1992, and appellant again declined to discuss the matter. Prior to each interview, DeConcini read appellant his *Miranda* rights.

Between 12:15 and 12:30 a.m. on June 27, 1992, DeConcini and a Chicago police officer decided to confront appellant with the evidence in the case. As appellant was escorted from his interview room into a large roll-call room where the guns and other evidence seized from McCollum's home were displayed, an officer again read appellant his *Miranda* rights. Appellant stated "Okay. I did it" and proceeded to explain his role in the murders.

Appellant told police that he and Logan went to the gun store in Minneapolis the day before the murders, intending to kill the employees and steal weapons. When they arrived, three employees were present. He believed all were armed and that he didn't have enough bullets to "do" everyone in the store. Consequently, he and Logan returned the next day just before the store closed at 7:00 p.m. After the few customers left, appellant walked toward the cash register, pulled out his Davis Industries .380 handgun and shot the first employee in the forehead from about seven feet. He turned and shot the other employee twice. He said he then heard another shot. He and Logan emptied a cardboard box, collected weapons, and put them in the box. They returned to Mankato, switched cars, and drove to Chicago.

Appellant explained that prior to the murders he had bought guns and sold them on the street for profit. A Mankato gun shop owner became nervous about selling so many guns to appellant and stopped selling to him. Consequently, appellant had to commit the murders in order to obtain additional guns.

Appellant identified the Davis Industries .380 semi-automatic handgun present in the roll-call room as the gun he used during the robbery and homicide. He also identified the cardboard box used to load the guns. Police then summoned a court reporter who took a formal statement from appellant at approximately 1:20 a.m. The sworn statement is similar to the previous oral confession except appellant declined to state who was present with him during the robbery and murder. Neither the initial confession nor the formal statement were tape recorded.

Appellant raises the following eight issues on appeal:

1. Whether appellant's constitutional right to a fair trial was violated by the trial court's denial of challenge for cause to four prospective jurors;

2. Whether appellant was denied his right to trial by a fair cross-section of the community;

3. Whether appellant was denied his right to a fair trial and due process by the trial court's failure to dismiss the indictment against appellant;

4. Whether appellant was denied his constitutional right to a fair trial when he was unable to gain access to information under the control of the BATF;

5. Whether appellant's right to due process was violated by failure of police to record the confessions;

6. Whether the pre-trial photographic identification techniques were appropriate;

7. Whether the trial court erred by admitting portions of the testimony of Betty Cole as an adoptive admission of appellant; and

8. Whether the trial court abused its discretion by imposing consecutive life sentences.

First, appellant asserts the trial court erred by denying appellant's challenge for cause to four prospective jurors. Two of those jurors ultimately served on the jury. Appellant exercised peremptory strikes with respect to the other two prospective jurors.

■ Minnesota Rule of Criminal Procedure 26.02, subd. 5, provides the exclusive grounds upon which jurors may be challenged for cause. *State v. Alladin*, 408 N.W.2d 642, 649 (Minn.App.), *pet. for rev. denied*, (Minn., Aug. 12, 1987). To prevail on a claim of juror bias appellant must fulfill the three-prong test articulated by this court in *State v. Stufflebean*, 329 N.W.2d 314, 317 (Minn.1983). Appellant must demonstrate: (1) that the juror was subject to a challenge for cause; (2) that actual prejudice resulted from the failure to dismiss the juror; and (3) that trial counsel made an appropriate objection. *Id.* On reviewing the trial court's decision whether to remove a juror for cause, this court gives deference to the trial judge because the trial judge is in the best position to observe prospective jurors. *State v. Graham*, 371 N.W.2d 204, 206 (Minn.1985). We hold that the trial court did not err in declining to remove any of the four jurors for cause.

■ After being accepted as a juror, one juror contacted the judge with concerns about her ability to remain unbiased because she had inadvertently read a newspaper article about co-defendant Logan's sentencing. The attorneys interviewed her again and she indicated her responses to previous questions, including her belief in the presumption of innocence, remained unchanged. The trial court did not err in refusing to dismiss this juror for cause.

■ Appellant sought to have another juror removed for cause because she expressed concern about her potentially emotional response to the proceedings. The juror had not read about the murders and had no preconceived ideas about the case. There is no evidence this juror was emotionally distraught at any part of the proceedings, nor is there evidence that prejudice resulted from this juror's participation. The trial court did not err in denying appellant's motion to dismiss this juror for cause.

■ Another prospective juror's niece was murdered in 1974. *See Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Defense counsel inquired whether sympathy for the victims' families might influence her decision. She testified that she did not believe she would use her potentially emotional response as a basis for a decision, and the trial court denied appellant's motion to remove this prospective juror for cause. Assuming appellant has standing to challenge the trial court's refusal to remove a juror for cause where appellant exercised a preemptory strike against that prospective juror, we conclude the trial court did not err in declining to remove this juror for cause. Crime victim status is not one of the exclusive grounds provided in Minn.R.Crim P. 26.02, subd. 5, and there was no showing that being the victim of a crime established any preconceived bias in the mind of the prospective juror. *See State v. Williams*, 361 N.W.2d 473, 476 (Minn.App.), *pet. for rev. denied*, (Minn., Apr. 12, 1985).

■ Appellant challenged the fourth prospective juror because she is an educational case manager for at-risk students. As part of her job she communicates with the Hennepin County Juvenile Court and on occasion attends court. Again, appellant exercised a peremptory strike against this prospective juror. Jurors in similar working relationships have been permitted to sit on juries. *See Stufflebean*, 329 N.W.2d at 317; *State v. Hanson*, 286 Minn. 317, 176 N.W.2d 607 (1970) (permitting jurors to sit where one juror was cousin of sheriff and several jurors

had business relations with county attorney); *State v. Jackson,* 275 Minn. 462, 147 N.W.2d 689 (1967) (former deputy sheriff). The trial court did not abuse its discretion by refusing to dismiss this prospective juror for cause.

■ The trial court denied appellant's pretrial motion challenging the racial composition of the jury venire summoned in November 1993. The 50 person panel included one person of color. The court summoned an additional 25 prospective jurors to complete jury selection; three were persons of color. Thus, the 75 person venire included four persons of color. On appeal, appellant argues he was denied his right to be tried by a fair cross-section of the community because persons of color were underrepresented on the jury venire.

This court recently addressed the question of the statistical underrepresentation necessary to establish a violation of the Sixth Amendment fair cross-section requirement. *State v. Williams,* 525 N.W.2d 538 (Minn. 1994). In *Williams,* this court articulated the standard necessary to establish a prima facie violation of the Sixth Amendment fair cross-section requirement.

> In our opinion, the key part of the showing required of a defendant challenging a venire on Sixth Amendment grounds should be that over a significant period of time—panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels and that this results from "systematic exclusion," that is, unfair or inadequate selection procedures used by the state rather than, *e.g.,* a higher percentage of "no shows" on the part of people belonging to the group in question.

*Id.* at 543.

Appellant established that the minority population of Hennepin County is approximately 10.6 percent. The 75 person jury venire summoned in Roan's case was 5.3 percent minority. Thus, the racial disparity in Roan's jury venire is somewhat larger than that in *Williams. See id.* at 542. Moreover, since 1980, Hennepin County juries on average have reflected only 5.2 percent minority representation. During the 20–week period from January 4, 1993, to May 17, 1993, only 5.1 percent of prospective jurors identified by race were members of a racial minority. However, during that period on average, approximately nine percent of prospective jurors apparently declined to list their race.

Although appellant may have shown that over a period of time the group of eligible jurors of color has been underrepresented, appellant failed to demonstrate the underrepresentation results from "systematic exclusion." *See Williams,* 525 N.W.2d at 543.

The Hennepin County jury selection system uses registered voters, driver's licenses, and registered Minnesota identification card holders. The Hennepin County Grand Jury Task Force Report estimates that Hennepin County reaches over 98 percent of its citizens under the current jury selection system. Appellant has not demonstrated that Hennepin County's selection procedures in any way constitute systematic exclusion, and therefore his Sixth Amendment claim fails.

Appellant challenges his grand jury indictment on the following grounds: (1) the prosecutor's failure to ascertain whether the grand jury was affected by media coverage of the case; (2) admission of an unsworn statement by Betty Cole; and (3) alleged prosecutorial misconduct in response to grand jury inquiries regarding Darren Hardaway.[1]

"[A] presumption of regularity attaches to the indictment, and it is a rare case where an indictment will be invalidated." *State v. Inthavong,* 402 N.W.2d 799, 801 (Minn.1987). Thus, a criminal defendant bears a heavy burden when seeking to overturn an indictment. *State v. Scruggs,* 421 N.W.2d 707, 717

---

1. In November 1992, appellant moved to dismiss his indictment. On March 11, 1993, Judge McKinsey presided over a consolidated hearing to determine whether several alleged improprieties relating to the grand jury that returned indictments for Roan and three other defendants were so inherently prejudicial that dismissal of the indictments was warranted. The district court denied the motion to dismiss the indictments as to each defendant, including appellant. On May 7, 1993, Judge Carey filed an Order and Memorandum denying appellant's motion to dismiss the indictment on several grounds specific to appellant's case.

(Minn.1988); Minn.R.Crim.P. 18.02, subd. 2. We examine each of the grounds alleged by appellant.

### 1. Media exposure

■ Appellant does not specifically allege prejudice with respect to the significant media exposure in the case, but rather urges this court to adopt a rule requiring a prosecutor to inquire into grand jury media exposure. We decline to do so here.

There is no record of anyone making reference to media coverage of matters pending before the grand jury. Thus, this case differs from *State v. Johnson*, 441 N.W.2d 460, 465–66 (Minn.1989), where this court dismissed defendants' indictments because of cumulative error in the grand jury proceedings, based in part on the county attorney's reference to newspaper coverage of pending homicide cases without discouraging the grand jurors from exposing themselves to that media coverage. Appellant produced no evidence of prejudice resulting from any alleged media exposure by the grand jury.

### 2. Admission of unsworn statement

At the grand jury proceeding, the prosecutor read Betty Cole's unsworn statement to police because Cole was unavailable to testify before the grand jury. Appellant argues that reading the unsworn statement introduced inadmissible evidence on which the grand jury returned the indictment. *See* Minn.R.Crim.P. 18.06, subd. 1(5). Betty Cole testified at trial.

■ An indictment must be based upon admissible evidence. Minn.R.Crim.P. 18.06. However, if otherwise inadmissible evidence is introduced before the grand jury, an indictment will not be dismissed if there is sufficient evidence to sustain the indictment, and it is not shown that "incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it." *State v. Thompson*, 273 Minn. 1, 15, 139 N.W.2d 490, 502, *cert. denied*, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966). There was substantial admissible evidence against appellant including appellant's confession. Thus, we conclude that the

grand jury would have returned the indictment even without Cole's statement. Consequently, we need not reach the question whether a statement to police satisfies the "sworn statement" requirement of Minn. R.Crim.P. 18.06, subd. 1(5). *See Scruggs*, 421 N.W.2d at 717.

### 3. Prosecutor's statements to grand jury regarding Hardaway

■ During the testimony of Sergeant Morrill before the grand jury, a grand juror asked, "[w]asn't there a third suspect also?" The prosecutor responded, "[w]e can't really discuss anything with respect to Mr. Hardaway" and "[h]e's not a suspect. I can tell you he's not a suspect in this case." Appellant's challenge raises a question of prosecutorial misconduct.

As a general rule, a prosecutor should honor grand jury requests for additional evidence, *State v. Wollan*, 303 N.W.2d 253, 255 (Minn.1981). A prosecutor should not knowingly withhold evidence from the grand jury which would tend to substantially negate a suspect's guilt. *See State v. Olkon*, 299 N.W.2d 89, 105–06 (Minn.1980), *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

Whether or not additional information concerning Hardaway was exculpatory, the failure to produce exculpatory evidence " 'will not require reversal unless it would have materially affected the [grand jury] proceeding.' " *State v. Moore*, 438 N.W.2d 101, 104–05 (Minn.1989) (quoting *Olkon*, 299 N.W.2d at 106).

It is very unlikely that permitting the grand jury to investigate Hardaway would have materially altered the grand jury's decision to indict Roan because the grand jury also had Roan's confession before it. We hold that any error committed by the prosecutor in deflecting questions about Hardaway was harmless. *See* Minn.R.Crim.P. 31.01.

■ Next, appellant asserts that the State, because of its working relationship with the BATF, was required to disclose an allegedly exculpatory tape recording of Betty Cole within the possession of the BATF. In November 1993, appellant served a subpoena

duces tecum on the BATF for all documents pertaining to its federal investigation of Hardaway and Cole, specifically requesting the tape recording. The BATF refused to disclose the tape, asserting that any disclosure would jeopardize an ongoing federal investigation. On the morning of trial, the trial court granted the U.S. Attorney's motion to quash the document portion of the subpoena.

At trial, the BATF agents testified they were instructed not to answer questions about the on-going federal investigation. Agent Keaton acknowledged the existence of the on-going federal investigation into "gun running" and money laundering involving Hardaway and Cole, and he acknowledged that federal agents postponed Hardaway's indictment. He testified that Hardaway was not an "informant" and that neither Hardaway nor Cole had made a "deal" with federal agents. Moreover, on cross-examination of Betty Cole, appellant emphasized Cole's potential bias, highlighting her relationship with Hardaway and her pregnancy at the time of his arrest. Appellant repeatedly emphasized that Hardaway's indictment was delayed.

Appellant argues the BATF information should have been disclosed under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the trial court's quashing of the subpoena duces tecum violated appellant's right to a fair trial. In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97.

Minn.R.Crim.P. 9.01, subd. 2(1), provides for discovery of matters in the possession or control of other governmental agencies.

> Upon motion of the defendant, the court for good cause shown shall require the prosecuting attorney, * * * to assist the defendant in seeking access to specified matters relating to the case which are within the possession or control of an official or employee of any governmental agency, but which are not within the control of the prosecuting attorney. The prosecuting attorney shall use diligent good faith efforts to cause the official or employee to allow the defendant access at any reasonable time and in any reasonable manner to inspect, photograph, copy, or have reasonable tests made.

Minn.R.Crim.P. 9.01, subd. 2(1).

Moreover,

> The prosecuting attorney's obligations under [rule 9.01] extend to material and information in the possession or control of members of the prosecution staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to the prosecuting attorney's office.

Minn.R.Crim.P. 9.01, subd. 1(7).

Minn.R.Crim.P. 9.01, subd. 1(7), is dispositive on this issue. The BATF, as a federal agency, does not "report" to the Hennepin County prosecutor's office within the meaning of Minn.R.Crim.P. 9.01, subd. 1(7). Moreover, appellant does not allege that the prosecutor withheld information in this matter, and we conclude that the prosecutor fulfilled the diligent good faith requirement of Minn.R.Crim.P. 9.01, subd. 2(1).

Even if the trial court erred in quashing the subpoena, a new trial is required only if the BATF's nondisclosure was material to the outcome of the verdict. *See State v. Clark*, 296 N.W.2d 359, 370–71 (Minn.1980).

> * * * [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)).

The jury was aware of a potentially relevant ongoing federal investigation. Given appellant's confessions and the ballistic evidence linking appellant with the murders, BATF's refusal to disclose additional information does not warrant a new trial.

■ Appellant asserts that police failure to record his confessions violated his right to due process and that his confession was involuntary. In *State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994), this court held that "all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention." We clearly stated that the rule established in *Scales* applies *prospectively* from June 30, 1994, the date the opinion was filed. *Id.* at 593. Thus, the police officer's failure to record appellant's confessions did not violate *Scales.*

Having carefully reviewed the circumstances surrounding appellant's confession we conclude that appellant's confession was voluntary. *See State v. Ture,* 353 N.W.2d 502 (Minn.1984). This court considers several factors in making this determination including the appellant's "age, maturity, intelligence, education, experience, and the ability to comprehend." *State v. Orscanin,* 283 N.W.2d 897, 899 (Minn.), *cert. denied,* 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385 (1979).

■ Appellant received six separate *Miranda* warnings including the warning administered immediately before he commenced his formal statement to police. He received a *Miranda* warning upon his arrest, when questioned by Agent Keaton, when questioned by Sergeant DeConcini at 2:40 p.m. and again near midnight, by Sergeant Walsh in roll-call room, and prior to his formal statement. He indicated he understood those rights. There was no evidence appellant was emotional prior to his confession, nor was there evidence of coercion. Appellant was permitted to use the bath-

room, and ate pizza with the officers during his detention in Chicago. Based upon the totality of the relevant circumstances we conclude that appellant's statement was voluntary.

■ Appellant asserts the photographic line-up employed by police was "so unnecessarily suggestive as to create a 'very substantial likelihood of irreparable misidentification.' " *State v. Montjoy,* 366 N.W.2d 103, 106–07 (Minn.1985) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Admission of identification evidence derived from suggestive identification procedures violates due process. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). However, a lineup need not use "exact clones" of the accused. *State v. Farr,* 357 N.W.2d 163, 165 (Minn.App. 1984). Nor must a photographic display exactly follow the description of the suspect. *State v. Myers,* 413 N.W.2d 122, 125 (Minn. App.), *aff'd as modified,* 416 N.W.2d 736 (Minn.1987).

■ The photographic line-up observed by witnesses consisted of seven polaroid photographs of African–American men taken by a Chicago police officer. Photograph number one was a picture of Hardaway, number three was of Logan, and number six was of Roan. Appellant asserts the photographic lineup was impermissibly suggestive because both appellant and Logan have short, cropped hair. Of the remaining four "filler" photographs, only one other participant also had very short hair. The other three had medium-short to medium length hair. Appellant repeatedly called the jury's attention to perceived deficiencies in the line-up on cross-examination.[2]

In *State v. Vance,* 392 N.W.2d 679, 683 (Minn.App.), *pet. for rev. denied,* (Minn., Oct. 29, 1986), the court held that a photographic display shown to the victim was not impermissibly suggestive although defendant's was the only photograph among seven that portrayed a man with a mustache extending past

2. The fact that a photographic display is not unnecessarily suggestive does not prevent the defense from attacking an eyewitness identification by showing the jury that the display from

which the witness first identified defendant was suggestive. *State v. Specht,* 359 N.W.2d 612, 613 (Minn.1984).

the corners of his mouth. The display included four photographs of men with mustaches, one with a beard, and two without facial hair. *Id.; see also Montjoy,* 366 N.W.2d at 106 (lineup not impermissibly suggestive although the accused was the only participant with a beard and the ages of participants varied within 12–year range); *State v. King,* 296 Minn. 306, 310, 208 N.W.2d 287, 290 (1973) (holding that lineup in which defendant was "conspicuously taller" than other participants was not unduly suggestive); *State v. McConoughey,* 282 Minn. 161, 167–68, 163 N.W.2d 568, 573 (1968) (holding that nine-man lineup was not impermissibly suggestive where defendant was the only participant with freckles).

We conclude that the trial court did not abuse its discretion in finding that the photographic lineup was not so impermissibly suggestive as to violate appellant's due process rights.

▇▇▇ Appellant challenges as inadmissible hearsay Betty Cole's testimony describing appellant's gesture "[l]ike a gun to the head" when appellant was implicitly asked to confirm Logan's report that each of them had shot a man. Minn.R.Evid. 801(d)(2)(B) provides that the statement of a third person offered against a party is not hearsay and is therefore admissible where the party "has manifested an adoption [of the statement] or belief in its truth." In a criminal proceeding, any waiver of the constitutional right to confront an accuser must be clear and unequivocal. *Village of New Hope v. Duplessie,* 304 Minn. 417, 421, 231 N.W.2d 548, 551 (1975). Therefore, "the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are *unequivocal, positive, and definite* in nature, *clearly showing* that in fact defendant intended to adopt the hearsay statements as his own." 304 Minn. at 425, 231 N.W.2d at 553 (emphasis in original).

In *State v. Shoop,* 441 N.W.2d 475, 482 (Minn.1989), a nod of the head was sufficient to constitute an adoptive admission under the guidelines established in *Duplessie.* In *Shoop,* a witness testified that the co-defendant stated, "I didn't do it, [defendant] did." 441 N.W.2d at 482. The trial court permitted the witness to testify that he saw the defendant nod his head affirmatively immediately after the comment. *Id.* The trial court properly admitted the head nod as an adoptive admission of defendant because "[t]he record demonstrates [the witness'] positive and unequivocal testimony that he saw defendant affirm [co-defendant's] statement by nodding his head." *Id.* Betty Cole's testimony describing appellant's gesture is certainly as definitive as the nod of the head in *Shoop,* 441 N.W.2d at 482, and therefore we conclude that it is sufficiently "unequivocal, positive and definite" to qualify as an adoptive admission.

▇▇▇ Finally, appellant challenges the trial court's imposition of consecutive life sentences. When sentencing a person convicted of multiple counts of first-degree murder, the trial court has discretion to impose concurrent or consecutive life sentences. Minn.Stat. § 609.15, subd. 1 (1994); *State v. Brom,* 463 N.W.2d 758, 765 (Minn.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991). When reviewing the imposition of consecutive life sentences, this court considers whether the sentences are commensurate with culpability or whether they exaggerate the defendant's criminality. *Id.; Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979). The court is guided by sentences received by past offenders. *State v. Miller,* 488 N.W.2d 235, 241 (Minn.1992).

▇▇▇ Appellant contends consecutive sentences exaggerate his culpability. A review of cases properly imposing consecutive sentences demonstrates that the consecutive sentences here in no way exaggerate appellant's criminality. *See, e.g., Miller,* 488 N.W.2d at 241 (upholding three consecutive sentences permissible where defendant shot and killed three victims as they slept); *Bangert,* 282 N.W.2d at 547 (upholding consecutive sentences where defendant shot and killed two sleeping victims). Appellant executed the brutal, premeditated killing of two store employees in order to obtain guns for sale on the street. We conclude that the trial court did not abuse its discretion by imposing consecutive sentences in this case.

The judgment of conviction and sentencing is affirmed.

Affirmed.