*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1808**

State of Minnesota,
Respondent,

vs.

Robert Earl Boyce,
Appellant.

**Filed January 22, 2024**
**Affirmed**
**Cochran, Judge**

Hennepin County District Court
File No. 27-CR-22-3465

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, John Donovan, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Slieter, Presiding Judge; Cochran, Judge; and Larson, Judge.

**NONPRECEDENTIAL OPINION**

**COCHRAN**, Judge

In this direct appeal from a final judgment of conviction for first-degree aggravated robbery, simple robbery, and fifth-degree possession of a controlled substance, appellant challenges his conviction on two grounds. Appellant first argues that the district court

erred by denying his motion to strike the jury venire because it did not represent a fair cross-section of the community. Appellant next contends that the district court clearly erred by denying his *Batson* challenge because the prosecution's peremptory removal of the only Black prospective juror violated the Equal Protection Clause of the United States Constitution. Appellant therefore asserts that he is entitled to a new trial and that his convictions must be reversed. We affirm.

**FACTS**

In February 2022, respondent State of Minnesota charged appellant Robert Earl Boyce with one count of simple robbery and one count of fifth-degree possession of a controlled substance based on allegations that, while in Hennepin County, Boyce hit a victim with a baseball bat, stole money from the victim, and was found in possession of several prescription pills. The state later amended the complaint to add one count of first-degree aggravated robbery. Boyce pleaded not guilty, and the matter was scheduled for a jury trial in Hennepin County.

Before the jury was sworn, Boyce, who is Black, challenged the composition of the prospective jury panel, which he refers to as the "jury venire."[1] Boyce argued that the jury

---

[1] Jury "venire" is defined as "[a] panel of persons selected for jury duty and from among whom the jurors are to be chosen." *Black's Law Dictionary* 1869 (11th ed. 2019). Our caselaw sometimes uses the terms "jury pool," "jury venire," and "jury panel" interchangeably. *See, e.g.*, *State v. Griffin*, 846 N.W.2d 93, 100-01 (Minn. App. 2014) (quotation omitted), *rev. denied* (Minn. Aug. 5, 2014). Additionally, the rules of criminal procedure appear to use "jury list" in place of "jury pool" and use "jury panel" in place of "jury venire." *See* Minn. R. Crim. P. 26.02, subds. 1-2. Based on our review of recent caselaw, we conclude that "jury pool" describes the group of jurors summoned for jury service during a given week, "jury venire" describes the group of prospective jurors drawn from the jury pool for voir dire in a particular case, and "jury panel" describes the jurors

2

venire violated Minnesota Rule of Criminal Procedure 26.02, subdivision 1, because only two prospective jurors identified as people of color and only one of those jurors identified as Black. Boyce asserted that, as of 2010, the population of Hennepin County residents who identify as Black "is at least 12 percent, possibly more" but only three percent of the "prospective jury panel" or jury venire identified as Black. Boyce argued that this discrepancy impeded his right to a fair trial.

In response to Boyce's challenge, the state argued that Hennepin County's jury-selection procedures do comply with Minnesota law and described these procedures in detail. The state explained that the county compiles a "master jury list" that consists of voter registration records, driver's-license records, and state identification card records, and uses a "random selection process" to select prospective jurors from this list. The state described the random selection process as "blind" to demographic characteristics like race and therefore "totally immune" to purposeful or inadvertent discrimination. Lastly, the state noted that the county's jury-selection procedures were "mandated" by Minnesota law and far "exceed[ed] the National Center for State Courts' inclusivity goal of 85 percent."

Defense counsel characterized the state's argument as implying that, "because this is how Hennepin County and the [c]ourts have always done it, it's okay." Defense counsel then noted that a district court in another county rejected a similar argument and "ordered a change to the jury selection process in response to concerns that the racial makeup of juries [did not] reflect Minnesota's diversity." Defense counsel also explained that she had

---

seated in that case. *See, e.g.*, *State v. Lockhart*, No. A22-0094, 2023 WL 1098182, at *1 (Minn. App. Jan. 30, 2023).

tried three cases in the past four weeks and that, in her experience, the underrepresentation of people of color in jury panels was a "systematic problem."

The district court denied Boyce's motion to strike the jury venire. The district court noted that, to succeed in his motion, Boyce had to show that (1) "the group allegedly excluded is a distinctive group within the community," (2) "the group in question was not fairly represented in the venire," and (3) "the underrepresentation was the result of a systemic exclusion of that group." The district court found that Boyce satisfied the first element because Black people "are a distinctive group within the community." The district court found that Boyce satisfied the second element because it was a "problem" that none of the prospective jurors in the jury venire except "maybe one" identified as Black. But the district court found that Boyce had not satisfied the third element because he had not demonstrated that the composition of the jury venire resulted from the "systemic exclusion" of Black people.

The parties proceeded with jury selection. During voir dire, the district court asked the prospective jurors if any of their family members or friends had been accused or convicted of a crime.[2] Prospective juror 15 indicated that his brother had been arrested, incarcerated, and prosecuted for a serious crime but that the charges against him were dropped after video evidence revealed that he was not the perpetrator of the crime. When the district court asked if his brother's experience would affect prospective juror 15's

---

[2] "Voir dire" is defined as "[a] preliminary examination of a prospective juror by a judge or lawyer to decide whether the prospect is qualified and suitable to serve on a jury." *Black's Law Dictionary* 1886 (11th ed. 2019).

ability to be a fair juror, prospective juror 15 stated: "I don't know until I actually listen to what's going on *and* if I can *see* what happened. You know, some laws do—you know, some [of] the laws are just—it's 50/50. I'll put it to you that way." (Emphasis added.) The district court again asked prospective juror 15 if he thought he could be a fair and impartial juror, and the following exchange occurred:

> PROSPECTIVE JUROR: For me, it's fair enough, you know, if I just listen to hear what's going on. Because like I said, some of the laws that—it's just not right, I'll put it to you that way. And then it's just some of the things that—I'm just amazed how things can be written and can be broken at the same time.
>
> COURT: So for laws—this case involves charges of simple robbery, drug possession, aggravated robbery. Are those some of the laws that you think you have problems with how the law is written?
>
> PROSPECTIVE JUROR: Well, I would say, like I said, it just depends on the crime and the evidence that's been proven, you know, stuff like that. That's what I see, if I can see it and listen to it, I can give a good analys[is] to figure out what's happening.
>
> COURT: And so you'll definitely have witnesses to listen to. I have no idea other evidence or not. So are you saying you'll keep an open mind to listen to the witnesses? Or would you have to see something on video?
>
> PROSPECTIVE JUROR: Well, it's an open mind.

During defense counsel's questioning, prospective juror 15 again stated that he could not "make a judgment off something [he could not] hear or see."

5

The prosecutor exercised a peremptory strike of prospective juror 15. Boyce raised a *Batson* challenge because prospective juror 15 was "the sole Black juror on [the] panel."[3] The prosecutor explained that she struck prospective juror 15 because of his "potential bias against the [s]tate and in favor of the defendant based on his experience with his brother." The prosecutor also expressed concerns about the prospective juror's need to "see" the evidence because there was no video evidence in the case. Lastly, the prosecutor noted that the prospective juror "mentioned that he didn't know whether or not he could be fair and impartial until he heard and saw the evidence," which "raise[d] all sorts of concerns for the [s]tate about [prospective juror 15's] ability to . . . be a fair and impartial juror." Boyce argued that the prospective juror's experience with his brother was similar to that of another prospective juror, and emphasized that the other prospective juror was not "chosen to be the first strike by the [s]tate." The prosecutor responded that the state "share[d] the same concerns" about that other prospective juror and was considering striking her as well.[4]

The district court denied Boyce's *Batson* challenge. After expressing doubt as to whether Boyce had made a prima facie showing that the peremptory strike was based on race, the district court concluded that the prosecutor's reasons for exercising the peremptory strike were race neutral and "sufficient to overcome a *Batson* challenge."

_____

[3] *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that the Equal Protection Clause of the United States Constitution prevents parties from striking prospective jurors based solely on their race); *see also State v. Carridine*, 812 N.W.2d 130, 136-37 (Minn. 2012) (applying *Batson*).

[4] This prospective juror was not ultimately seated on the jury panel.

The jury found Boyce guilty on all counts. The district court convicted Boyce of first-degree aggravated robbery and fifth-degree possession of a controlled substance and imposed a 67-month executed prison sentence for first-degree aggravated robbery and a 19-month stayed prison sentence for fifth-degree possession of a controlled substance, to be served concurrently.

Boyce appeals.

**DECISION**

Boyce argues that he is entitled to a new trial because the district court erred by denying his motion to strike the jury venire and clearly erred by denying his *Batson* challenge. We consider these issues in turn.

**I.      The district court did not err by denying Boyce's motion to strike the jury venire.**

Boyce first argues that the district court erred by denying his motion to strike the jury venire because the jury venire "did not represent a fair cross-section of the community." We review de novo fair-cross-section challenges. *Griffin*, 846 N.W.2d at 99.

The United States and Minnesota Constitutions guarantee a criminal defendant the right to a "jury venire" that "reflect[s] a fair cross-section of the community." *Griffin*, 846 N.W.2d at 99-100 (quotation omitted); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury of the . . . district wherein the crime shall have been committed . . . ."); Minn. Const., art. I, § 6 (same); Minn. R. Crim. P. 26.02, subd. 1 ("The jury list must be composed of persons randomly selected from a fair cross-section of qualified county residents."). But neither federal nor state

7

constitutional law "guarantee[s] a criminal defendant a jury of a particular composition or one that mirrors the community." *State v. Williams*, 525 N.W.2d 538, 542 (Minn. 1994).

To make a prima facie showing that a jury venire did not reflect a fair cross-section of the community, a defendant must show that (1) "the group allegedly excluded is a 'distinctive' group in the community," (2) "the group in question was not fairly represented in the venire," and (3) "the underrepresentation was the result of a 'systematic' exclusion of the group in question from the jury selection process." *Id.* (quoting *Duren v. Missouri*, 439 U.S. 357, 364-67 (1979)).[5]

Boyce contends that he made a prima facie showing that the jury venire did not reflect a fair cross-section of the community because he demonstrated all three elements of a prima facie case. The state asserts that Boyce did not make the required prima facie showing because he failed to establish the second and third elements of a prima facie case. Assuming without deciding that Boyce met his burden on the first two elements of a prima facie case, we conclude that Boyce did not satisfy the third element. In other words, Boyce did not show that the exclusion of Black people from the jury venire was the result of their systematic exclusion from the jury-selection process.

To satisfy the third element, the defendant must establish "that over a significant period of time—panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels" due to their "systematic

---

[5] If the defendant makes a prima facie showing of a fair-cross-section violation, the state may rebut this showing by establishing that the jury selection process advanced a significant state interest. *Hennepin County v. Perry*, 561 N.W.2d 889, 896 (Minn. 1997).

exclusion" from those panels. *Griffin*, 846 N.W.2d at 101 (quoting *Williams*, 525 N.W.2d at 543). "Systematic exclusion" refers to "unfair or inadequate selection procedures used by the state rather than, e.g., a higher percentage of 'no shows' on the part of people belonging to the group in question." *Id.* at 102 (quotation omitted). In other words, systematic exclusion requires the defendant to show that the distinctive group at issue has been consistently underrepresented in jury venires as a result of the procedures used to identify and summon individuals for jury duty, *see Williams*, 525 N.W.2d at 542, and that the underrepresentation could not be explained by "reasonable and plausible alternative possibilities shown by the statistical data." *Griffin*, 846 N.W.2d at 102. Without evidence of systematic exclusion, we cannot conclude that the defendant was denied a right to a jury trial by a fair cross-section of the community. *See Andersen v. State*, 940 N.W.2d 172, 182 (Minn. 2020).

To determine what evidence is required to show systematic exclusion, we turn to relevant caselaw. In *State v. Roan*, the Minnesota Supreme Court held that Roan was not denied his right to a jury trial by a fair cross-section of the community because he did not show that the underrepresentation of "eligible jurors of color" was the result of their "systematic exclusion" from the jury-selection process. 532 N.W.2d 563, 569 (Minn. 1995) (quotation omitted). The supreme court noted that "[t]he Hennepin County jury selection system uses registered voters, driver's licenses, and registered Minnesota identification card holders" to identify prospective jurors and "reaches over 98 percent of [Hennepin County] citizens." *Id.* The supreme court therefore concluded that Roan had "not demonstrated that Hennepin County's selection procedures in any way constitute

9

systematic exclusion." *Id.* Similarly, in *Andersen*, the supreme court held that a member of the White Earth Band, a federally recognized tribe, was not denied his right to a fair trial because he did not demonstrate that the jury-selection process systematically excluded Native Americans. 940 N.W.2d at 181-82. The supreme court first observed that the jury-selection procedures at issue were the same as those used in Hennepin County and upheld in *Roan*. *Id.* at 182. The supreme court then emphasized that Andersen had "adduced no historical or contemporaneous evidence or statistical analysis to factually support his argument that" Native Americans were systematically excluded from the jury-selection process because of these procedures. *Id.* Accordingly, the supreme court concluded that Andersen's fair-cross-section challenge failed. *Id.*

Applying the relevant legal standard and applicable caselaw, we conclude that the district court correctly determined that Boyce failed to satisfy the third element of a fair-cross-section challenge. The record before the district court reflects that Boyce did not submit any evidence to support his assertion that Black people were underrepresented in the jury venire as a result of Hennepin County's jury-selection procedures. Boyce did not call any witnesses or submit any historical, contemporaneous, or statistical evidence to show that Black people were underrepresented in the jury venire as a result of Hennepin County's jury-selection procedures. Instead, Boyce relied solely on defense counsel's assertions about the number of Black people in Hennepin County relative to the percentage of Black people in the jury venire, as well as her account of another district court's response to a jury-venire challenge and her anecdotal experience with jury trials. Assertions and arguments by counsel are not evidence. *See State v. Bobo*, 770 N.W.2d 129, 142-43

10

(Minn. 2009) (stating that attorneys "may not make arguments that are not supported by evidence"). Because Boyce did not introduce any evidence to support his assertion that Black people were systematically excluded from the jury venire because of Hennepin County's jury-selection procedures, the district court did not err by denying Boyce's fair-cross-section challenge. *See id.*

On appeal, Boyce seeks to introduce new factual information to support his argument that the district court erred in its analysis of his fair-cross-section challenge. For example, Boyce cites to two news articles discussing racial disparities in jury pools and driver's-license records and one study addressing racial disparities in photo ID records. Because this information was not presented to the district court, it is not part of the record on appeal. *See* Minn. R. Crim. P. 28.02, subd. 8 ("The record on appeal consists of the documents filed in the district court, the offered exhibits, and the transcript of the proceedings, if any."). Therefore, we decline to consider this extra-record information as well as Boyce's arguments based on the information. *See Plowman v. Copeland, Buhl & Co.*, 261 N.W.2d 581, 583 (Minn.1977) ("It is well settled that an appellate court may not base its decision on matters outside the record on appeal, and that matters not produced and received in evidence below may not be considered."); *see also State v. Little*, 851 N.W.2d 878, 885 (Minn. 2014) (citing this aspect of *Plowman*).

In sum, Boyce did not meet his burden before the district court to show that Black people in Hennepin County have been "significantly underrepresented" in jury venires "over a significant period of time" as a result of their "systematic exclusion" from the county's jury-selection process. *See Griffin*, 846 N.W.2d at 101 (quoting *Williams*,

11

525 N.W.2d at 543). Therefore, Boyce has not made a prima facie showing that the jury venire did not reflect a fair cross-section of the community, and we discern no error in the district court's denial of Boyce's motion to strike the jury venire. *See id.*

## II.     The district court did not clearly err by denying Boyce's *Batson* challenge.

Boyce next contends that the district court clearly erred by denying his *Batson* challenge because the prosecutor's peremptory strike of the only Black person on the jury panel was based on racial discrimination. In general, we will not reverse a district court's ruling on a *Batson* challenge unless it is clearly erroneous. *State v. Harvey*, 932 N.W.2d 792, 811 (Minn. 2019); *State v. Pendleton*, 725 N.W.2d 717, 724 (Minn. 2007). A ruling is clearly erroneous when it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted).

A party may use a peremptory challenge "to strike a prospective juror that the party believes will be less fair than some others" in an effort "to select as final jurors the persons they believe will be most fair." *State v. Martin*, 773 N.W.2d 89, 100 (Minn. 2009) (quotation omitted). But a party may not use a peremptory challenge to strike a prospective juror based on race because it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV, § 1; *Batson*, 476 U.S. at 89; *see also Carridine*, 812 N.W.2d at 136-37 (applying *Batson*).

Minnesota courts use the three-step framework set forth in *Batson* to determine whether a peremptory challenge was motivated by racial discrimination. *Martin*, 773 N.W.2d at 101; *see also* Minn. R. Crim. P. 26.02, subd. 7(3). Under this framework,

> (1) the defendant must make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the juror in question; and (3) the district court must determine whether the defendant has carried the burden of proving purposeful discrimination.

*Martin*, 773 N.W.2d at 101. We consider each step of the *Batson* analysis in turn.

A.      *Step One:  Prima Facie Case of Discrimination*

Step one of the *Batson* analysis requires the defendant to "make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race." *Id.*

When deciding Boyce's *Batson* challenge, the district court expressed "some concern" about whether Boyce had satisfied step one of the *Batson* analysis but did not resolve the question before proceeding to step two. When the district court proceeds to step two of the *Batson* analysis, "the question as to step one is moot on appeal." *State v. Lufkins*, 963 N.W.2d 205, 210 (Minn. 2021). Here, the district court proceeded to step two of the *Batson* analysis. Accordingly, the issue of whether Boyce made a prima facie case of racial discrimination is moot. *Id.*

B.      *Step Two:  Race-Neutral Explanation*

At step two of the *Batson* analysis, the state must "offer a reasonably specific explanation that the court can use to determine whether that reason is related to the case being tried." *Id.* at 211 (emphasis omitted). This explanation does not need to be

"persuasive or even plausible." *Martin*, 773 N.W.2d at 101. And this explanation "will be deemed race-neutral unless a discriminatory intent is inherent in the . . . explanation." *Pendleton*, 725 N.W.2d at 726 (quotation omitted). "A family member's involvement with a criminal investigation is a race-neutral reason for striking a juror." *State v. Martin*, 614 N.W.2d 214, 222 (Minn. 2000).

The prosecutor offered three reasons for striking prospective juror 15: (1) the prosecutor was concerned about the prospective juror's "potential bias . . . in favor of the defendant based on his experience with his brother;" (2) the prosecutor was concerned about the prospective juror's need to "see" the evidence because there was no video evidence in the case; and (3) the prospective juror "mentioned that he didn't know whether or not he could be fair and impartial until he heard and saw the evidence," which raised questions about his ability to be a fair and impartial juror. The district court concluded that these reasons were sufficiently race-neutral to overcome a *Batson* challenge.

Boyce argues that the district court's reasoning at step two of the *Batson* analysis was insufficient because the district court accepted the prosecutor's reasons "at face value," without testing their validity. Boyce relies on the supreme court's decision in *State v. McRae*, 494 N.W.2d 252 (Minn. 1992), to support his argument. In *McRae*, the supreme court concluded that the prosecutor had violated *Batson* by striking a prospective juror based on her responses to questions about "the system" and the fact that both she and the defendant were Black. 494 N.W.2d at 253-54, 257. In rejecting these explanations, the supreme court expressed concerns about "the exaggeration employed by the prosecutor" in describing the prospective juror's responses and noted that consideration of

14

her race was "expressly forbid[den]" by *Batson*. *Id.* at 257. The supreme court also questioned the district court's understanding of *Batson* and explained that the second and third steps of the *Batson* analysis require the district court "first to determine whether the prosecutor has articulated a facially race-neutral explanation for striking the juror in question and then to test the validity of the explanation—that is, to determine whether the proffered race-neutral reason" was pretextual, which the district court failed to do. *Id.* Boyce relies on this articulation of the *Batson* analysis to argue that the district court in this case was required "to test the validity of the prosecutor's stated reasons for the strike" at the second step of the *Batson* analysis but "failed" to do so.

Boyce's reliance on this language from *McRae* is misguided. In stating that district courts must "test the validity of the [prosecutor's] explanation" to determine "whether the proffered race-neutral reason" was pretextual, the supreme court is merely describing the third step of the *Batson* analysis that occurs after the second step; it is not adding to the second step some sort of testing requirement. *See id.* As stated above and recognized in *McRae*, the second step of the *Batson* analysis requires courts to consider only whether the prosecutor's explanation for excluding the prospective juror in question is "reasonably specific," not whether it is pretextual. *Lufkins*, 963 N.W.2d at 211; *see also McRae*, 494 N.W.2d at 253, 257.

Based on our review of the record and relevant caselaw, we conclude that the district court did not clearly err at step two of the *Batson* analysis. The prosecutor explained that the state was concerned about potential bias against the state in favor of the defendant due to the prospective juror's brother's involvement with a criminal investigation—namely, the

15

brother's arrest and prosecution for a crime he did not commit. This reason alone is sufficient to satisfy step two of the *Batson* analysis. *See Martin*, 614 N.W.2d at 222. We therefore conclude that the district court did not clearly err by determining that the state's reasons for excluding prospective juror 15 were sufficiently race neutral.

### C.    Step Three:  Purposeful Discrimination

Finally, step three of the *Batson* analysis requires the party challenging the peremptory strike to prove that the "strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive." *Pendleton*, 725 N.W.2d at 726 (quotation omitted).

The district court determined that Boyce had not shown that the prosecutor's reasons for striking prospective juror 15 were pretextual, in light of the prospective juror's responses to questioning during voir dire.

Boyce contends that the district court clearly erred by determining that the prosecutor's reasons for striking prospective juror 15 were not pretextual because (1) the prosecutor exaggerated the prospective juror's responses to the district court's questions about fairness and impartiality; (2) the prosecutor did not question the prospective juror about the reasons she provided for striking him; and (3) "[s]tatistical disparities in the jury composition show the strike was a pretext." For the reasons below, we are not persuaded.

### *"Exaggeration" of Responses*

Boyce first argues that the prosecutor unfairly exaggerated the prospective juror's responses to the district court's questions about fairness and impartiality. This argument is not supported by the record.

16

Boyce is correct that exaggerating a prospective juror's responses to voir dire questions may support an inference that the prosecutor's explanation for striking the prospective juror was pretextual. *See McRae*, 494 N.W.2d at 257 (describing the prosecutor's "exaggeration" of a prospective juror's responses as "very troubling" and concluding that the prosecutor's explanation for striking the juror was "not the sort of racially-neutral explanation that the [Supreme] Court contemplated in *Batson*"). But the prosecutor did not exaggerate prospective juror 15's responses to questioning in this case. In striking prospective juror 15, the prosecutor expressed concern about the prospective juror's need to "see" evidence, in light of his experience with his brother, who was exonerated by video evidence. The prosecutor also expressed concern about prospective juror 15's statement that, before he could decide whether he would be a fair and impartial juror, he needed to "see" the evidence. The record reflects that prospective juror 15 repeatedly stated that he needed to "see" the evidence before he could decide whether Boyce was guilty and whether he could be fair and impartial. Thus, Boyce's contention that the district court clearly erred at step three of the *Batson* analysis because the prosecutor unfairly exaggerated prospective juror 15's responses to voir dire questions is not persuasive.

*Failure to Question*

Boyce next argues that "[t]he prosecutor's failure to question [prospective juror 15] during voir dire about [the prosecutor's] alleged concerns shows that her race-neutral reasons for the strike were a pretext." We are not persuaded.

Failure to meaningfully examine a prospective juror on a topic of concern during voir dire may be evidence of a pretext for discrimination. *See Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (explaining that the state's failure to ask a prospective juror questions about his brother suggested that its explanation for striking the prospective juror based on his brother's past was pretextual). But the district court extensively questioned prospective juror 15 about his experience with his brother, his need to "see" evidence, and his ability to be fair and impartial. And Boyce does not argue that a prosecutor's failure to ask a prospective juror additional questions about a topic of concern is evidence of pretext *after* the juror has been extensively questioned on the matter by the district court. Accordingly, Boyce's failure-to-question argument is unavailing.

*Statistical Disparities*

Lastly, Boyce contends that "[s]tatistical disparities in the jury composition further support the inference that the race-neutral explanations were pretextual." To support his argument, Boyce relies on *Miller-El v. Cockrell*, 537 U.S. 322 (2003). In that case, the state used its peremptory strikes to exclude 10 out of 11, or 91%, of Black prospective jurors, which the Supreme Court concluded was "unlikely" to occur by "[h]appenstance." *Cockrell*, 537 U.S. at 342.

This case is readily distinguishable from *Cockrell*. Here, the state struck only one Black prospective juror who just happened to be the only Black prospective juror.[6] The Minnesota Supreme Court has repeatedly held that the exclusion of the only juror of color by itself is insufficient to establish a *Batson* violation. *See State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989); *State v. Everett*, 472 N.W.2d 864, 868-69 (Minn. 1991); *State v. Bowers*, 482 N.W.2d 774, 776-78 (Minn. 1992). Because, unlike *Cockrell*, the state struck only one Black prospective juror, we conclude that Boyce's reliance on *Cockrell* is misguided.

In sum, Boyce has not demonstrated any record support for his contention that the prosecutor's reasons for striking prospective juror 15 were a pretext for discrimination. We therefore conclude that the district court did not clearly err by determining that Boyce did not meet his burden of proof under step three of the *Batson* analysis or by denying Boyce's *Batson* challenge. *See Pendleton*, 725 N.W.2d at 726.

**Affirmed.**

---

[6] The state disputes that there was only one Black juror in the jury venire, noting that one juror who was excused for cause spoke Amharic, which is "the official language of Ethiopia." *The American Heritage Dictionary of the English Language* 59 (5th ed. 2011). For purposes of this appeal, we accept Boyce's contention that the jury venire included only one Black prospective juror.