_____

No. 95-2787WM
_____

United States of America,           *
                                     *
          Appellee,                  *
                                     *  On Appeal from the United
     v.                              *  States District Court
                                     *  for the Western District
                                     *  of Missouri.
Ronald D. Jenkins,                   *
                                     *
          Appellant.                 *


_____

          Submitted:  January 9, 1996

              Filed:  March 6, 1996
          _____

Before RICHARD S. ARNOLD, Chief Judge, BOWMAN, Circuit Judge, and JONES,[*]
     District Judge.
          _____

RICHARD S. ARNOLD, Chief Judge.


     Ronald Jenkins appeals his convictions for conspiracy to distribute
and possession with intent to distribute cocaine in violation of 21 U.S.C.
§§ 841(a)(1), (b)(1)(A), and 846, and conspiracy to commit money laundering
in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(A)(i).  He argues that the
convictions are not supported by the evidence presented at trial.  Jenkins
also

_____

     [*]The Hon. John Bailey Jones, United States District Judge for
the District of South Dakota, sitting by designation.

appeals his sentence claiming that the District Court[1] miscalculated the drug quantity, and that he should have been granted a reduction in his sentence under U.S.S.G. § 5K2.0.  We affirm both the convictions and the sentence.

I.

This is a classic case of a network of people who chose to devote their time and energy to the distribution and sale of cocaine and cocaine base.  Ronald Jenkins, the defendant, was a key member of an ongoing scheme to transport drugs from Los Angeles, California, to Kansas City, Missouri, where the drugs were distributed.  The organization was responsible for over 100 kilograms of cocaine being introduced into the Kansas City drug market between 1987 and 1992.

James Jenkins, the defendant's brother, organized and ran the drug-distribution network which was supplied from Los Angeles by Shannon Thames and Reevious Henderson.  Other members of the organization included Reggie House, Ronald Smith, Shawn Stubbs, and Sandy Lyles, who transported the cocaine from Los Angeles to Kansas City.  Once in Kansas City, the drugs were distributed by Diamond Coleman, Keenan Hart, and others.  The defendant facilitated the conspiracy in at least two ways:  he allowed his home to be used as a "safe house," and he assisted in the accounting of drug proceeds, including disbursing money to the distributors and wiring money to Los Angeles.

Evidence of the defendant's performance of each of these roles is overwhelming.  The testimony of co-conspirators leaves no doubt that the defendant allowed his home to be used as a "safe house" in furtherance of the conspiracy.  First, he allowed the couriers to

_____

[1]The Hon. D. Brook Bartlett, United States District Judge for the Western District of Missouri.

stay in his home during their trips to Kansas City.  Second, large amounts of cocaine were stored in the basement of his home at his instruction.  Once the cocaine was sold, couriers returned to the defendant's home with the drug proceeds, which were also stored in his basement.

The evidence that the defendant actively participated in the accounting of the drug proceeds is also compelling.  On at least five occasions the defendant received drug proceeds from Hart and Coleman.  The money was delivered to the defendant at his home in brown paper bags containing $1,000 bundles with the total amount received ranging from $10,000 to $20,000.  The defendant stored the money in his basement.  On another occasion, the defendant, with Hart, James Jenkins, and Coleman present, counted $100,000 in drug proceeds which had been stored in a garbage bag at his home.  In addition to storing and counting the drug proceeds, he was also active in their disbursement.  He gave money to co-conspirators when instructed to do so by James Jenkins, and he wired money from the sale of the drugs to Los Angeles.[2]  He also instructed Hart on how to avoid Internal Revenue Service reporting requirements when sending large sums of money via Western Union.

In January of 1993, the defendant was charged in a seven-count indictment for his drug-related activities.  Following the trial, the jury returned a verdict of guilty on Count Two for conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, and on Count Seven for conspiracy to conduct money laundering.  He was sentenced to 15 years and 8 months' imprisonment on Count Two, and five years' imprisonment on Count Seven, to run concurrently.  The defendant also must serve a five-year term of supervised release on Count Two and a three-year term of supervised release on Count Seven to run concurrently.  He now

---

[2]According to the record, Jenkins wired $93,650 in drug proceeds to Los Angeles between July of 1987 and April of 1990.

appeals both his convictions and his sentence.

                                    II.


     The defendant challenges the sufficiency of the evidence with regard
to his drug conspiracy and money-laundering conspiracy convictions.  In our
review, we must view the evidence in the light most favorable to the
verdict.  United States v. Bascope-Zurita, 68 F.3d 1057, 1060 (8th Cir.
1995), cert. denied, 116 S. Ct. 741 (1996).  The verdict is given the
benefit of all reasonable inferences that might have been drawn from the
evidence presented.  Ibid.  Reversal is appropriate "only if we conclude
that a reasonable fact-finder must have entertained a reasonable doubt
about the government's proof of one of the offense's essential elements."
Ibid.


     In order to prove the existence of a conspiracy, "the government must
show an agreement between at least two people and that the agreement's
objective was a violation of the law."  United States v. Escobar, 50 F.3d
1414, 1419 (8th Cir. 1995).  The existence of the agreement may be proved
by either direct or circumstantial evidence.  Ibid.  Once the government
establishes the existence of a drug conspiracy, only slight evidence
linking the defendant to the conspiracy is required to prove the
defendant's involvement and support the conviction.  United States v.
Smith, 49 F.3d 362, 365 (8th Cir. 1995) (subsequent history omitted).


                                    A.


     The defendant argues that the government failed to prove that he knew
of the drug conspiracy or that he knowingly joined the conspiracy.  In
support of this argument he notes that there was no evidence that he sold
drugs, and that the testimony of his co-conspirators was contradictory and
refuted by defense witnesses.

                                   -4-

The government presented ample evidence of an agreement between James Jenkins and others to transport cocaine from Los Angeles to Kansas City. The proof included testimony describing numerous drug transactions which took place in Kansas City, some taking place in the defendant's presence. Testimony also established that the proceeds from these transactions were often wired to Los Angeles.

Contrary to the defendant's assertion, the government did offer evidence which not only demonstrated his knowledge of the overall conspiracy, but also demonstrated that the defendant's actions were necessary for the successful execution of the conspiracy. For example, Smith and Hart testified that they stayed at the defendant's home after transporting cocaine from Los Angeles to Kansas City. They also stored drugs and money from the sale of drugs at the defendant's home. Lyles testified that he made drug deliveries to Gilbert Dowdy and Stubbs at the defendant's home. Testimony also indicated that the defendant allowed his automobiles to be used to transport drugs.

We recognize that the testimony of the witnesses may have been inconsistent at times. It was the jury's duty, however, to weigh the credibility of the defendant's co-conspirators regarding the day-to-day transactions of the operation. See United States v. Lopez, 42 F.3d 463, 466 (8th Cir. 1994) (weighing credibility of witnesses was role of the jury). The jury apparently resolved the inconsistencies in favor of the government. We conclude that the testimony presented at trial, combined with the documentation of wire transfers presented, was sufficient to support the jury's conclusion that the defendant was a member of the overall drug conspiracy.

B.

The defendant challenges his conviction for money laundering

by claiming that the government failed to present evidence that he was aware that the wire transfers which he made were proceeds of drug activity, or that the transfers were made for the promotion of the drug conspiracy. He explains that he is guilty of nothing more than holding money for his brother and sending wire transfers.

In order to prove money laundering, the government must demonstrate

> (1) that the defendant conducted a financial transaction which involved the proceeds of unlawful activity; (2) that he knew that the property involved in the transaction was proceeds of some form of specified unlawful activity; and (3) that he "intend[ed] to promote the carrying on of specified unlawful activity . . ."

United States v. Cruz, 993 F.2d 164, 167 (8th Cir. 1993) (citations omitted). We have no doubt that a reasonable jury could have found sufficient evidence to support each element of this offense. Witness testimony and wire-transfer receipts confirm that the defendant made wire transfers of $93,650 in drug proceeds.

Further, the defendant's claim of innocence is incredible. Over a span of three years Ronald Jenkins received thousands of dollars in cash from Hart, Smith, House, and Coleman, all young men ranging in age from 15 to 19. He also was aware that his brother lived a lavish lifestyle -- he owned multiple homes, limousines, a Rolls Royce -- yet had no visible source of income. On at least one occasion, the defendant had over $100,000 in cash stored in a garbage bag in his home. A jury certainly could have concluded from this evidence that the defendant was aware that the money in question had resulted from drug activity. Lopez, 42 F.3d 463, 467 (recognizing that jury may infer from the evidence that defendants' money came from drug sales).

III.

Next, the defendant argues that his conviction for conspiracy to distribute and possess with intent to distribute cocaine must be reversed because the government failed to prove the existence of a single conspiracy as charged in the indictment, but instead proved multiple conspiracies. This alleged variance between the indictment and the proof presented at trial, he argues, is fatal. In support of his argument he notes that James Jenkins left the conspiracy in August of 1989. He also notes that other members of the conspiracy worked as couriers for drug suppliers other than James Jenkins.

Because the defendant failed to raise this issue below, our standard of review is one of plain error. United States v. Griggs, 71 F.3d 276, 279 (8th Cir. 1995). Under this standard, we may reverse only if the error has harmed the defendants' substantial rights. And even if the defendant's rights have been affected, whether to notice the error is a matter of discretion which is generally exercised only where the error affects the fairness, integrity, or public reputation of judicial proceedings. Ibid.

We are not convinced that the District Court erred in this case, plainly or otherwise. Whether the government proved a single conspiracy or multiple conspiracies is a question of fact for the jury to decide. United States v. Holt, 969 F.2d 685, 687 (8th Cir. 1992). The evidence presented at trial established that the defendant agreed to store money and drugs for the drug-distribution ring which included James Jenkins and a number of couriers. The fact that the conspirators changed over time does not necessarily establish the existence of varied conspiracies. Rather, where the remaining conspirators continue to act in furtherance of the conspiracy to distribute drugs, the conspiracy continues. See United States v. Rabins, 63 F.3d 721, 724 (8th Cir. 1995) (noting that change in drug suppliers indicated the varied phases of a

single drug conspiracy).  The defendant may not have been aware of every aspect of the conspiracy or the amount of each drug transaction.  See United States v. Edwards, 994 F.2d 417, 420 (8th Cir. 1993) (explaining that the commission of separate crimes by co-conspirators does not rule out the existence of a single conspiracy), cert. denied, 114 S. Ct. 701 (1994). But full knowledge of "all other conspirators or all details of the conspiracy" is not necessary "in order for a single conspiracy to exist of which the defendant is a part."  United States v. Adipietro, 983 F.2d 1468, 1475 (8th Cir. 1993).  Denial of the defendant's motion for judgment of acquittal was not plain error.

IV.

The defendant advances two arguments in hopes of lowering his sentence.  First, he claims that the Court erred in its calculation of the drug quantity for which he could be held responsible.  Second, he argues that the Court erred by refusing to grant him a § 5K2.0 downward departure. We reject both arguments for the reasons discussed below.

A.

The Court sentenced the defendant based on a criminal history category of I, with a base offense level of 36.  The guideline sentencing range for the defendant at level 36 is 188 to 235 months.  The defendant now contends that the Court miscalculated the quantity of cocaine attributable to him under U.S.S.G. § 1B1.3[3]

---

[3]United States Sentencing Guideline § 1B1.3(a) provides in part:

> [T]he base offense level . . . shall be determined on the basis of the following:
>
> * * *
>
>> (1)(B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a

-8-

when determining his base offense level.  We review the Court's drug-quantity determination for clear error.  Smith, 49 F.3d at 365.

Section 1B1.3 provides that the District Court may hold a co-conspirator responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).  Thus, a defendant may be held accountable for the criminal activities of other co-conspirators which "fall within the scope of criminal activity [he] agreed to jointly undertake," including "other drug transactions " which "are part of the same course of conduct or scheme."  United States v. Flores, 73 F.3d 826, 833 (8th Cir. 1996).

The Presentence Investigation Report (PSR) attributed responsibility to the defendant for 113.5 kilograms of cocaine based on several transactions between 1987 and 1990.  Upon defendant's objection, the Court made fact findings and concluded that the defendant was responsible for 113.5 kilograms.  See Fed. R. Crim. P. 32(c)(1); see also Holt, 969 F.2d 685, 688 (stating that court must make factual findings when relying on disputed facts in PSR).  The Court calculated the drug quantity attributable to the defendant on the basis of the testimony of his co-conspirators -- Reginald House, Ronald Smith, and Sanford Lyles.  Their combined testimony provided evidence of numerous drug

---

conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

transfers,[4] and wire transfers of drug proceeds.[5]  Even though the defendant did not participate actively in each of the transactions, we are convinced that "the conduct of [his] co-conspirators was reasonably foreseeable . . .." Smith, 49 F.3d at 366.

We have reviewed the transcript of the sentencing hearing and the PSR carefully, and we find a discrepancy between the testimony of House, and the facts recorded in the PSR and the factual findings made by the Court. According to the transcript, the Court attributed 11.25 kilograms of cocaine to the defendant on the basis of House's testimony.  House

---

[4]House testified that between 1987 and 1988 he made four trips to Kansas City transporting cocaine with a total weight of 1.25 kilograms.  The cocaine was stored at the Jenkins house.  He also testified that during 1988 Stubbs transported seven kilograms of cocaine to Kansas City, which were sold, and that the $10,000 in proceeds from the sale were given to the defendant at his house by James Jenkins.

Ronald Smith testified that he transported a total of 11.25 kilograms of cocaine to Kansas City during five separate trips to the city between 1987 and 1988.  On each of these trips Smith stayed at Jenkins's home, and on at least one visit, used the defendant's car to deliver drugs.  In additional testimony, Smith stated that he mailed five kilograms of cocaine to Jenkins's house, flew to Kansas City, and arrived at the house in time to receive the package.  Smith also left $32,000 in proceeds from the sale of 25 kilograms of cocaine, at James Jenkins's instruction, with Clearliss Starr to be picked up by the defendant.

Lyles testified that in the summer of 1989 he gave one kilogram of gift-wrapped cocaine to the defendant as instructed by James Jenkins.  Also, in September of that year, Stubbs transported 50 kilograms of cocaine to Kansas City.  The defendant was present when 30 kilograms of this cocaine were sold.  Lyles also testified that James Jenkins informed him that one kilogram of the remaining cocaine was given to the defendant.  In 1990, Lyles delivered ten kilograms of cocaine to Stubbs at the defendant's house and was told by the defendant to put the cocaine in his basement.

[5]Testimony at trial revealed that a total of $93,650 of drug proceeds was sent to California by wire transfer in the name of Ronald Jenkins, the defendant.  The total amount of wire transfers exceeded $600,000.

testified that he made five trips to

Kansas City transporting cocaine in the following amounts: nine ounces on three separate trips, 18 ounces on a fourth trip, and seven kilograms on a fifth trip. In the PSR, House is listed as having transported 10 kilograms on the fifth trip. The Court also found that he transported 10 kilograms on the fifth trip and made this finding a part of its cocaine-quantity calculation for § 1B1.3 purposes. This finding is not supported by the record. House testified that on the fifth trip he transported 7 kilograms of cocaine to Kansas City.

The calculation error in this case, however, did not impact the defendant's sentence. The remaining drug-quantity finding of 110.5 kilograms, which was not clearly erroneous, still qualifies the defendant for a base offense level of 36.[6]

B.

After calculating the defendant's base offense level, the Court entertained his motion for a departure under U.S.S.G. § 5K2.0.[7] It considered each factor in favor of departure and decided, albeit reluctantly, to deny the motion for departure. The

---

[6]In fact, the 110.5 kilograms of cocaine attributed to the defendant is a conservative estimate in light of the large amount of money involved in the wire transfers. We have stated that drug quantities may be extrapolated from such financial information. United States v. Ortiz-Martinez, 1 F.3d 662, 675 (8th Cir.), cert. denied, 114 S. Ct. 355 (1993).

[7]Section 5K2.0 of the United States Sentencing Guidelines provides in relevant part:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that prescribed."

defendant now claims that the Court's refusal to depart was an abuse of discretion because the Sentencing Guidelines do not take into account the unique circumstances of this case, including the fact that this was his first offense, he was employed for over 21 years, his brother's involvement in the conspiracy was the "main reason" the defendant himself participated, and he did not have knowledge of the breadth of the conspiracy. In the alternative, he argues that his behavior was an aberrant occurrence which provides a sufficient basis for downward departure under § 5K2.0.

We may review the court's decision not to depart if that decision is premised on the belief that the court lacked the authority to do so. United States v. Jackson, 56 F.3d 959, 960 (8th Cir. 1995). Our appellate jurisdiction, however, does not extend to a district court's refusal to exercise its discretion and grant a departure. Ibid. The defendant's case falls into that category of cases over which we have no jurisdiction. Here, the Court considered the arguments and concluded that they did not support a downward departure under § 5K2.0. The defendant urges that the Court was not aware of its authority to depart, while the government argues that the Court decided not to exercise its discretion in this case. After a careful review of the sentencing hearing transcript, we are persuaded that the Court recognized its authority to depart under § 5K2.0 and simply chose not to exercise that discretion based on the facts of this case.

Moreover, and in the alternative, we simply could not agree with the defendant's claim that failure to grant a downward depart in this case was an abuse of discretion. When considering a departure, a sentencing court should look "to the totality of [the] individual circumstances" to determine if an unusual situation not contemplated by the Commission is created. United States v. Parham, 16 F.3d 844, 848 (8th Cir. 1994). The Court concluded that the circumstances of this case were not so unusual as to warrant a departure. Based on the evidence before us, we cannot say that

this finding was mistaken.

In certain cases, we have recognized that a departure based on a single act of aberrant behavior may be warranted. Ibid.; but see United States v. Bieri, 21 F.3d 811, 819 (8th Cir.) (first-time offender status does not justify a downward departure), cert. denied, 115 S. Ct. 208 (1994). We have defined a single act of aberrant behavior as an act that is "spontaneous and seemingly thoughtless." United States v. Atkins, 25 F.3d 1401, 1405 (8th Cir.), cert. denied, 115 S. Ct. 371 (1994). The defendant's ongoing involvement in the drug conspiracy and in the transfer of drug proceeds over a five-year period does not appear to fall into the category of aberrant behavior.[8] See United States v. Premachandra, 32 F.3d 346, 349 (recognizing "that a spontaneous and

---

[8]The Court made the following observation when considering the defendant's aberrant-behavior argument:

> So I don't think 5K2.0 is -- can legitimately be used to place an argument before the sentencing judge that, "Hey, we have a good person here" unless, unless you have the kind of situation that the courts have recognized as being aberrant behavior. And that is the single instance, out of the blue, and apparently not followed up on. I mean, of a single instance of, for instance, violent behavior, . . . no previous history of assaultive behavior and no history after. It's just a blip on the screen.
>
> Now that isn't the evidence with regard to this defendant. The evidence with regard to this defendant is a blip that lasted for a relatively long time. It wasn't that on one occasion, at one time, he inadvertently, accidentally or intentionally, but for one occasion, allowed somebody to come to his house and stay overnight who it turned out later was a drug dealer.
>
> The evidence in this case is that the defendant in a number of different ways contributed to the success of this criminal conspiracy over a lengthy period of time. Not days, not months, but years.

S. Tr. 103-04.

-14-

seemingly thoughtless act may be a basis for departure").  Thus, the Court's denial of the defendant's § 5K2.0 motion was not an abuse of discretion.

V.

The defendant's convictions and his sentence are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.