_____

95-3597
_____

United States of America,        *
                                  *
     Appellee,                    *
                                  *   Appeal from the United States
     v.                           *   District Court for the
                                  *   Eastern District of Missouri
Louis Williams,                   *
                                  *
     Appellant.                   *

_____

          Submitted:   April 9, 1996

             Filed:   June 26, 1996
_____

Before BEAM and MURPHY, Circuit Judges, and BURNS,* District Judge.
_____


MURPHY, Circuit Judge.


     Louis Williams appeals from his convictions for conspiracy, 18 U.S.C.
§ 371, money laundering, 18 U.S.C. § 1956(a), forgery, 18 U.S.C. § 471 and
2, and stealing and receiving, 18 U.S.C. § 641 and 2.  He and his
coconspirators were involved in a scheme to profit from 67 blank United
States Treasury checks stolen from a St. Louis postal center.  We affirm.


     Williams contends on appeal that: (1) the government's cross-
examination of him created an improper inference of guilt; (2) the
admission of a coconspirator's statements violated the hearsay rule and his
right to confrontation; (3) there was insufficient evidence to support his
conviction of money laundering; (4) the district


_____

     *The HONORABLE JAMES M. BURNS, United States District
     Judge for the District of Oregon, sitting by
     designation.

court abused its discretion in giving certain exhibits to the jury during its deliberation; and (5) the district court erred in giving two jury instructions on possession of stolen property and the inferences permitted to be drawn from that possession.[1]

## I.

Sometime during the late summer of 1993, Tommie Penson, a St. Louis resident, learned from a friend, Jobe Reid, that Joe Ellis had access to blank United States Treasury checks through his employment at the St. Louis post office. Penson told Reid he could cash the checks in Mexico. Reid promptly contacted Ellis, who then stole seven blank Treasury checks, beginning on October 1, 1993. Ellis understood from Reid that he would receive a portion of the proceeds raised by the checks.[2]

At some point, Penson discussed the Treasury checks with Williams, a longtime associate who lived in Texas. Penson and Williams had done business before, partly through an entity owned by Penson called the Royal Oaks Estates. After talking with Penson, Williams recruited a Mexican citizen, Genaro Alvarez, to cash one of the checks in exchange for part of the proceeds. Alvarez flew from Texas to Mexico City in October 1993, and met Maria Nelda San Martin, an associate of Penson and Williams. On October 29, Alvarez presented a Treasury check made payable to him in the amount of $1,165,000 at a money exchange house in Mexico

---

[1]Williams has also submitted pro se materials which raised additional issues. Since Williams is represented by counsel, these pro se materials would not normally be considered. See United States v. Blum, 65 F.3d 1436, 1443 n.2. (8th Cir. 1995), cert. denied, 116 S.Ct. 1435 (1996). We have reviewed his submissions, nevertheless, but find in them no meritorious issue requiring our discussion.

[2]Ellis and Reid both entered guilty pleas, received downward departures for cooperation, and filed Rule 35 motions in exchange for their testimony in Williams' trial.

City. He received a cashier's check for $50,000 in his name as an advance, and the check was later paid in full by the Federal Reserve Bank in Minneapolis, Minnesota. Williams spoke with Penson and told him to have the "Treasuries" in place in Mexico. Williams then told his girlfriend, Elena Cantu, that he had to conclude a deal in Mexico, and he arrived on October 30 in Mexico City, where he met Penson and Nelda.

During the first week of November 1993, Williams, Penson, and Nelda agreed on the disbursement of the $1,165,000 check. Penson channeled most of the funds into a Texas bank account maintained by Nelda's brother, Jose San Martin. From that account, Penson directed the disbursement of $400,000 to his St. Louis accounts and $95,000 to Nelda's account in Mexico City. On behalf of Williams, Penson made a series of wire transfers into bank accounts maintained by Williams, Elena Cantu, and Williams' ex-wife.

On November 15, 1993, Penson flew back to St. Louis after arranging for Williams to become a signatory on his Royal Oaks Estates account at the Banco Mexicano in Mexico City. Penson then transferred $10,000 of the stolen money from his St. Louis account to the Royal Oaks account the following day. Penson and Williams communicated some twelve times by phone and fax during this period.

Prior to Penson's departure from Mexico, he agreed with Williams and Nelda to obtain more stolen Treasury checks. Penson contacted Reid, who persuaded Ellis to steal approximately 60 blank checks on November 12, 1993. Nelda received the checks on November 14 and collaborated with Williams, Penson, and Alvarez to make six of the checks payable to Emilio Sanchez Martinez in amounts ranging from eight to eleven million dollars, the proceeds of which they agreed to share. On November 15, Alvarez unsuccessfully tried to pass two of these checks in Mexico.

On November 17, 1993, the St. Louis postal center received a

3

copy of one check for $10,000,000. Postal inspectors immediately began an investigation. They interviewed Alvarez on November 21, who told them about cashing the $1,165,000 check. Penson was arrested in St. Louis shortly thereafter on November 24.[3] He told postal inspectors that he had no knowledge of the stolen Treasury checks, and he did not mention his association with Williams or Nelda.

Following his arrest, Penson remained in contact with Williams through his friend, Eddie Walker. Williams, who was staying at Nelda's residence in Mexico City during November and December 1993, spoke to Penson and Walker some 90 times. Penson and Williams continued to disburse the funds from the $1,165,000 check and persuaded Jose San Martin to pay $12,000 of the stolen money to Penson's wife on December 1, 1993. They also attempted to cash another stolen check. Williams told Walker in December 1993 that Penson and Alvarez were his partners in an ongoing "deal." Around December 20, 1993, Penson had Walker contact Williams in New York about that deal. At that time, one of the stolen checks in the amount of $9,980,000 was being processed at the Banco Mexicano's New York office after having been presented at the bank in Mexico. Williams called the Banco Mexicano from New York several times, but the check did not clear.

Williams was arrested over a year later, on January 9, 1995, as he attempted to enter the United States in San Diego. He was carrying a check written to his Mexico City landlord on the Royal Oaks Estates account, a hotel bill listing him as a representative of Royal Oaks, and other papers linking him to the conspirators in this case.

---

[3]Penson and Alvarez were convicted in 1994 for their activities; the convictions were affirmed in 1995. United States v. Penson, 62 F.3d 242 (8th Cir. 1995). Williams was not tried until July 1995.

4

At trial, Williams denied knowledge of, or participation in, any activity related to the stolen Treasury checks and their proceeds. He was found guilty on all counts (except one that had been dismissed). Since most of the issues that Williams raises on appeal pertain to events at trial, the relevant facts are incorporated in our discussion.

## II.

Williams first argues that the government improperly created an inference of guilty silence by cross-examining him about his failure to call Postal Inspector Ted Orona about the Treasury checks. Elena Cantu had testified at trial that after Penson's arrest she asked Williams to contact Orona concerning the Treasury checks, but that Williams became upset and denied knowledge of them. Jose San Martin had also testified that he told Williams in December 1993 to contact Orona and that Williams said he would. Orona then testified that he had asked Cantu and San Martin to tell Williams to call him, but he never did. There was no objection to any of this testimony.

Later, during his cross-examination, Williams testified that he could not remember being told to contact Inspector Orona and that he had not called him. Defense counsel objected to this line of questioning, stating that: "[Williams] has absolutely no obligation to answer questions, call an agent, and give statements about some case." The district court overruled his objection. Williams now asserts that his cross-examination testimony was improperly admitted as an adoptive admission under Fed.R.Evid. 801(d)(2)(B)[4] because Orona had not accused him of anything.

---

[4]Rule 801(d)(2)(B) provides that a statement is not hearsay if it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth."

A criminal defendant who takes the stand in his own behalf "cannot avoid testifying fully."  See Jenkins v. Anderson, 447 U.S. 231, 236 n.3 (1980).  Once the choice to testify is made, "[t]he interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant . . . ."  Id. at 238.  Here, Williams testified that he did not conspire with Penson to cash stolen treasury checks and that his presence in New York during the time a stolen check was being processed was merely coincidental.  The government's questioning on cross-examination about Williams' alleged failure to call Inspector Orona was related to his denial on direct examination of any involvement in a conspiracy or attempt to conceal a conspiracy.  The prosecution thus "did no more than utilize the traditional truth-testing devices of the adversary process."  Id.  The district court did not abuse its discretion in determining the proper scope of cross-examination.  See United States v. NB, 59 F.3d 771, 777 (8th Cir. 1995) (standard of review).

Williams next contends that certain statements of Penson were improperly admitted as an exception to the hearsay rule and that this violated his Sixth Amendment right to confrontation.  Following his arrest, Tommie Penson told investigators that he had funded wire transfers with money borrowed from an unidentified source, that he did not know about any stolen Treasury checks, and that he was not in Mexico when the $1,165,000 stolen check had been presented.  Penson did not mention Williams or other conspirators.  Although Penson did not testify at trial, his statements were admitted as those of a coconspirator under Fed.R.Evid. 801(d)(2)(E).  Williams argues that Penson's statements were not made in furtherance of the conspiracy since he had already been arrested, and that he was therefore entitled to a cautionary instruction under the Sixth Amendment.

Fed.R.Evid. 801(d)(2)(E) permits the admission, as nonhearsay, of statements made "by a coconspirator of a party during the course

6

and in furtherance of the conspiracy."  Under this rule, the government must prove, by a preponderance of the evidence, that a conspiracy existed, that the defendant and declarant were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy. United States v. Lewis, 759 F.2d 1316, 1342 (8th Cir.), cert. denied sub nom. Milburn v. United States, 474 U.S. 994 (1985).  The district court's preliminary factual determinations regarding these elements are reviewed for clear error.  United States v. Alonzo, 991 F.2d 1422, 1425 (8th Cir. 1993).

The arrest of one coconspirator does not necessarily terminate the conspiracy.  United States v. Smith, 600 F.2d 149, 153 (8th Cir. 1979) (citation omitted).  Rather, a conspiracy is presumed to exist until there has been an affirmative showing that it has been terminated so long as there is "a continuity of purpose and a continued performance of acts." Lewis, 759 F.2d at 1343.

Statements made during the concealment phase of the conspiracy may also be admissible under Rule 801(d)(2)(E).  Id.  In making this determination, courts must be careful to ensure that the statements occurred during an ongoing conspiracy and were made in furtherance of it. Id. A conspiracy is ongoing where "acts of concealment were undertaken to preserve the conspiracy and foil attempts at detection."  Id.  Such a case generally exists where the conspiracy is a continuing arrangement with a series of objectives, and concealment is essential to and in furtherance of the survival of its operation.  Id.  Post-arrest confessions or statements incriminating others by one coconspirator are generally not made in furtherance of a conspiracy.  See Alonzo, 991 F.2d at 1425-26 (coconspirator's in-custody identification of cocaine source not admissible against other conspirators under Rule 801(d)(2)(E)).

The purposes of the charged conspiracy in this case included

the theft, receipt, forgery, and concealment of U.S. Treasury checks and the receipt and concealment of fraudulently obtained money. Williams was also charged with being a fugitive and communicating with other conspirators in an effort to conceal his involvement in the conspiracy and avoid detection by law enforcement authorities. Although Penson's statements to authorities were made after his arrest in November 1993, he did not confess to stealing the checks or to a conspiracy, nor did he incriminate any of his fellow conspirators. Rather, his denial of knowledge of the checks and his failure to mention Williams or other conspirators enabled the coconspirators to continue to pursue their common objectives. For example, on December 1, 1993, Penson and Williams persuaded Jose San Martin to pay $12,000 of the stolen funds to Penson's wife in an effort to conceal the money. Williams also attempted to cash a stolen Treasury check in New York in the amount of $9,980,000 nearly three weeks after Penson's arrest, and Williams told one of Penson's associates that Penson and Alvarez were also involved in that deal.

These actions demonstrate that the conspiracy was continuing to function actively at the time of Penson's statements, and that the statements were made in furtherance of the conspiracy's objectives to profit from the stolen checks and continue functioning without discovery. See Lewis, 759 F.2d at 1343; Smith, 600 F.2d at 153. The district court did not err in admitting the challenged statements pursuant to Rule 801(d)(2)(E), and Williams' Sixth Amendment right of confrontation was not violated.[5] See Bourjaily v. U.S., 483 U.S. 171, 182-85 (1987) (Confrontation

---

[5]Even if Penson's statements were hearsay, their admission would have been harmless error in light of all the evidence. See Alonzo, 991 F.2d at 1427 n.7. The statements did not implicate Williams or acknowledge any criminal activity. A number of witnesses testified during the seven day trial about Williams' participation in the conspiracy, and the government introduced more than eighty exhibits.

Clause not violated if evidence falls within coconspirator exception to the hearsay rule); United States v. Morgan, 997 F.2d 433, 437 (8th Cir. 1993).

Williams' third argument is that there was insufficient evidence to support his conviction for money laundering. Count VI of the indictment charged a violation of 18 U.S.C. § 1956(a) based on a $10,000 wire transfer on November 16, 1993, from Tommie Penson's bank account in St. Louis to the Royal Oaks Estates account in Mexico City. Williams acknowledges that he became a signatory on the Royal Oaks account in November 1993 at Penson's request. He contends, however, that his mere association with that account is not enough to prove he aided or abetted Penson in the charged transfer.

A challenge to the sufficiency of the evidence requires a review of the evidence in the light most favorable to the verdict. United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996). We cannot reverse unless "a reasonable factfinder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." Id. The required elements of money laundering in this case are:

> (1) that the defendant conducted a financial transaction which involved the proceeds of unlawful activity; (2) that he knew that the property involved in the transaction was proceeds of some form of specified unlawful activity; and (3) that he intended to promote the carrying on of specified unlawful activity.

Id. (citation omitted).

The evidence at trial established that Williams' share of the proceeds from the $1,165,000 check cashed in October 1993 had been transferred into his Texas bank account. He expected even bigger proceeds from the theft of 60 more blank Treasury checks in mid-

9

November 1993, but unlike Maria Nelda, he did not have a bank account in Mexico to receive any funds. He testified at trial that Penson asked him around this time to open an account in Mexico so that he "would be able to some things for him in his absence." Williams obliged by becoming a signatory on the Royal Oaks Estates account at the Banco Mexicano in Mexico City. After Penson left Mexico City on November 15, 1993, $10,000 was transferred the next day from his St. Louis account to the Royal Oaks Estates account. Penson and Williams communicated some twelve times by phone and fax during the two days surrounding the transfer. Two months after this transfer, Williams wrote a check purporting to be drawn on that account. At the time of his arrest over a year later, Williams was carrying a check written to his landlord on the Royal Oaks account and a hotel bill listing him as a representative of Royal Oaks.

The jury could have reasonably concluded from this evidence that Williams intentionally and knowingly helped bring about the wire transfer involving proceeds from the stolen Treasury checks. See id. at 1288. There was thus sufficient evidence to support each element of the money laundering offense and the district court did not err in overruling Williams' motion for a judgment of acquittal.

Williams' fourth contention is that the district court abused its discretion in sending to the jury certain exhibits related to the Royal Oaks Estates account. During the second day of deliberation, the jury requested a copy of the $10,000 wire transfer to Royal Oaks, the "names of persons on card file for the Royal Oaks Estate account," and "any records of money taken out of account after transfer" of the $10,000. Materials related to the latter two requests were not in evidence as the trial judge noted on the request form. In response to the first request, the court sent to the jury all of the documents admitted into evidence which related to the Royal Oaks account (apparently thirteen). Williams

argues that this evidence was not relevant on the money laundering count, that it was an inappropriate comment on the evidence, a summary of the prosecution's theory, and a mere suggestion "that these things [must] mean something."  Appellant's Brief at 19.

Generally, jurors may examine any document properly admitted in evidence.  United States v. DeCoito, 764 F.2d 690, 695 (8th Cir. 1985). The trial court has "considerable discretion" to send exhibits to the jury during its deliberation, and the court's determination will not be reversed on appeal unless it has abused its discretion.  United States v. Venerable, 807 F.2d 745, 747 (8th Cir. 1986); United States v. Robinson, 774 F.2d 261, 275 (8th Cir. 1985).

It was not an abuse of discretion to send these exhibits into the jury.  All of the requested items pertained to the Royal Oaks Estates account, and all of the documents concerning that account were sent back without comment on the evidence.  Each document was properly admitted in evidence, and the court appropriately exercised its discretion in responding to the jury request.  See DeCoito, 764 F.2d at 695.

Finally, Williams asserts that the district court erred in overruling his objections to two jury instructions on possession of stolen property. Instruction 47 defined actual, constructive, and joint possession,[6] and instruction 46 provided that, if the jury found beyond a reasonable doubt that Williams' possessed the stolen Treasury checks or government money, it could infer that the property was stolen and that he "participated in some way in the

---

[6]Instruction 47 provided that possession includes actual, as well as constructive possession, and also sole as well as joint possession.  Actual possession occurred when a person "knowingly has direct physical control over a thing," while constructive possession referred to "power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons."

11

theft of the property."  Williams claims that he was only charged with stealing the proceeds from the checks, not the actual checks.  He therefore argues that instruction 47 impermissibly allowed the jury to infer that he constructively possessed the checks, and that instruction 46 allowed the jury to infer that he was guilty of stealing the checks.

So long as an instruction correctly states the law, and relates to issues in the case and facts developed by the evidence, it is not erroneous.  United States v. Nazarenus, 983 F.2d 1480, 1487 (8th Cir. 1993).  Both instructions correctly stated the law.  See United States v. Ali, 63 F.3d 710, 716 (8th Cir. 1995) (upholding similar instruction on definition of possession);  United States v. Clark, 45 F.3d 1247, 1250 (8th Cir. 1995) (upholding similar instruction on inferences to be drawn from possession of stolen property).  The issues and evidence also warranted the giving of these instructions.  Contrary to Williams' contention, his alleged participation was not limited to stealing the proceeds.  He was also charged in Count I with causing blank Treasury checks to be stolen and forged.  Ample testimony and documents indicated Williams possessed the stolen checks and proceeds, and participated in their theft and forgery. Both instructions were therefore well within the district court's discretion.  See Nazarenus, 983 F.2d at 1487.

For the reasons stated above, the judgment in Williams' case is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

12