STATE of Minnesota, Respondent,

v.

Montery T. WILLIS, Appellant.

No. C7–95–2705.

Supreme Court of Minnesota.

Feb. 13, 1997.

Mark D. Nyvold, St. Paul, for appellant.

Hubert Humphrey III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

BLATZ, Justice.

This case arises from the murder of Minneapolis Police Officer Jerome Haaf and the attempted murder of Gerald Lubarski on September 25, 1992. Montery T. Willis, convicted of two counts of first-degree murder and attempted first-degree murder, now seeks a new trial based on alleged errors committed by the trial court. He asserts six points of error, none of which requires reversal by this court. We, therefore, affirm his conviction and sentence.

The murder of Officer Haaf was planned by the Vice Lords' leadership in retaliation for the beating of a blind black man by Metropolitan Transit Commission police. A.C. Ford, who was second in command of the gang, proposed the idea of shooting a police officer at the Pizza Shack during a meeting at the home of Sharif Willis, appellant's uncle, the evening of September 24, 1992. Several of the others present during the discussion included appellant, Shannon Bowles,[1] a juvenile named Richard and Pepi McKenzie.

In the early morning of September 25, 1992, five of the men headed to the Pizza Shack. McKenzie rode in one car with Richard, while appellant, Ford and Bowles traveled in a second car. The cars stopped at 31st Street and 17th Avenue in Minneapolis where McKenzie and Bowles got out and walked toward the Pizza Shack, located at 1623 East Lake Street. Once inside, they fired several shots killing Officer Haaf and injuring Lubarski who was seated at the table with Haaf.

After the murder, police investigators were led to the appellant by one of Bowles' roommates, Eugene McDaniel. On the day of the shooting, McDaniel, who was being held on unrelated charges in the Anoka County jail, told authorities that he had telephoned both Bowles and appellant from the jail. McDaniel stated that from the two separate phone calls he had learned that Bowles and appellant had been involved in the killing and were preparing to flee to Texas in a black Cadillac or a Chevrolet Beretta. McDaniel stated that Bowles and appellant were at Sharif Willis' home.

That evening, at about 9:30 p.m., police went to Sharif Willis' home. They found the Cadillac packed with clothing and arrested both Bowles and appellant. While in custody, appellant received *Miranda* warnings and then was questioned briefly and released. Immediately after his release, appellant went to Chicago.

On November 14, 1992, while in Illinois, appellant participated in the stabbing murder of a Chicago man. On the night of November 15, 1992, he appeared in an Illinois court and the Cook County Public Defender's Office was appointed to represent him in the Illinois case.

On November 19, 1992, appellant, considered a "serious suspect" in the Haaf case, was interviewed in the Cook County Jail by Minneapolis police sergeants James DeConcini and Mark Lenzen. Prior to meeting with the Minnesota investigators, appellant signed an Illinois jail form consenting to speak to them, and, at the beginning of the

---

**1.** By time of trial, Bowles had changed his name to Nantanbu Noah Kambone. He will be re- ferred to as Bowles in this decision.

interview, DeConcini advised appellant of his *Miranda* rights. After appellant agreed to talk, the officers told appellant that the interview concerned the Minnesota case and did not relate to any Illinois crimes.

Appellant explained that he wanted to speak with the officers, but that he was concerned he would be killed if he were to cooperate with authorities. DeConcini told appellant that steps could be taken to ensure his safety, but appellant wanted such assurances in writing. DeConcini then contacted the Hennepin County Attorney's Office and both he and appellant spoke with Assistant Hennepin County Attorney Robert Streitz on the phone. Streitz then sent appellant's requested assurances of safety via a faxed letter. The letter, signed by Streitz, stated that appellant would be protected if he served time based on the information he provided in the Haaf slaying and that he would be provided with witness protection upon release. The letter also stated that appellant would be given witness protection or placed in a safe facility if he were "serving time on some unrelated matter."

After reviewing the fax, appellant agreed to make a statement concerning the Haaf murder. At no time during the interview did appellant request the presence of counsel. In his statement, appellant admitted to being at Sharif Willis' house when the decision to shoot a police officer was made. Appellant also told the officers that he rode in the front passenger seat of one of the two cars used; Ford drove and Bowles sat in the back.

On December 15, 1992, appellant was indicted in the Haaf case on three counts: (1) first-degree murder of Officer Jerome Haaf in violation of Minn.Stat. §§ 609.05 (1996) and 609.185, subd. 1 (1996); (2) murder of a peace officer in violation of Minn.Stat. §§ 609.05 (1996) and 609.185, subd. 4 (1992); and (3) attempted premeditated first-degree murder of Gerald Lubarski in violation of Minn.Stat. §§ 609.185, subd. 1 (1996), 609.17 (1996) and 609.05 (1996).

Four months later, on March 9, 1993, DeConcini interviewed appellant for a second time in the Cook County jail. Streitz also attended the interview, but asked no questions. Appellant was advised of his *Miranda* rights before he agreed to talk again. The second interview, like the first, was limited to Minnesota matters and included a discussion of the fact that appellant had been indicted for the Haaf killing. During this second interview, which lasted about an hour or two, appellant discussed how he and Bowles had planned to leave town.

At no time prior to the two interviews did the Minnesota investigators notify appellant's Illinois counsel that they intended to question appellant. Appellant's Illinois counsel, although aware that there was a Minnesota investigation, did not find out that her client had been visited in the jail by Minnesota detectives until she received a call from Streitz on March 15, 1993. Streitz wanted to work out a deal whereby appellant would return to Minnesota as a cooperating witness, but Streitz' efforts failed. Appellant's Illinois counsel successfully contested appellant's immediate return because appellant could have faced the death penalty or natural life in prison in Illinois if he were convicted first in Minnesota and subsequently convicted in Illinois.

In October 1994, a jury found appellant guilty of first-degree murder and home invasion in Illinois. On April 17, 1995, appellant made his first appearance on the Minnesota indictment. On October 2, 1995, appellant's trial began before a Hennepin County jury. The jury returned guilty verdicts on all counts in the indictment. Appellant received a sentence of life imprisonment for first-degree murder and 220 months for the attempted murder of Lubarski. The trial court ordered that the attempted murder sentence run concurrently to the first-degree murder sentence, but that the Minnesota sentence run consecutively to the Illinois murder sentence.

■ Appellant's first two assertions of error concern alleged violations of his Sixth Amendment right to counsel. Both the United States and Minnesota Constitutions guarantee a right of legal representation to anyone charged with a crime. U.S. Const. amend. VI; Minn. Const. art. 1, § 6. The right attaches when the state initiates adversary judicial proceedings against an accused "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972);

*State v. Ture,* 353 N.W.2d 502, 509 (Minn. 1984) (quoting *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882).

■ Appellant first argues that Minnesota investigators violated his Sixth Amendment right to counsel when they interviewed him on November 19, 1992 because appellant was represented in the Illinois case. The right, however, is offense specific, *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), and appellant had no Sixth Amendment right to counsel in the Haaf case because adversary proceedings had not commenced prior to the date of the first interview. The only Sixth Amendment right to counsel appellant had was in Illinois and, even if, as appellant argues, investigators spoke to him about his Illinois charges, the violation could only be asserted in the Illinois case. The alleged violation cannot be relied on in this case because of the offense specific nature of the right.

■ In a related argument, appellant contends the statement made during the first interview should be suppressed because Streitz spoke on the phone with the appellant without notifying appellant's Illinois counsel. Because no notification was made, the appellant argues, the prosecutor violated Minn.R.Prof.Conduct 4.2, which provides in part:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer *in the matter,* unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(Emphasis added.) The appellant contends unpersuasively that the behavior alleged to have violated this rule mandates exclusion of the statements. *See State v. Lefthand,* 488 N.W.2d 799, 801–02 (Minn.1992). In the instant case, there was no rule violation because Streitz did not interview appellant concerning the Illinois case and therefore did not discuss any matter for which appellant was being represented. Even if the rule was violated, exclusion for statements taken in violation of the rule is not required. *State v. Ford,* 539 N.W.2d 214, 225 (Minn.1995), cert. denied, — U.S. —, 116 S.Ct. 1362, 134 L.Ed.2d 529 (Apr. 1, 1996).

■ Second, appellant argues his Sixth Amendment right to counsel was violated when Minnesota authorities interviewed him on March 9, 1993. Appellant's right to counsel in Minnesota had attached prior to the second interview because he had been indicted on December 15, 1992. Appellant had not, however, invoked the right. Appellant claims that his failure to assert the right should be excused because his incarceration prevented him from exercising his right in Minnesota. We reject this argument. Appellant's incarceration did not hinder him in asserting his Sixth Amendment right; he could have done so simply by telling his interviewer he wanted an attorney before or during questioning.

■ Appellant's failure to request counsel is fatal to this claimed constitutional violation. When an unrepresented defendant does not request the presence of counsel during post-indictment questioning, the Sixth Amendment right to counsel may be waived. *Patterson v. Illinois,* 487 U.S. 285, 290–91, 108 S.Ct. 2389, 2393–94, 101 L.Ed.2d 261 (1988). A waiver of the Sixth Amendment right is "knowing and intelligent" when the waiver is made after a defendant is advised of *Miranda* warnings. *Id.* at 299–300, 108 S.Ct. at 2393–94. Here the appellant received *Miranda* warnings and waived them. His waiver of the Sixth Amendment right to counsel was therefore made knowingly and intelligently during questioning on March 9, 1993.

■ For his third claim of error, appellant asserts that the trial court erred when it allowed the state to introduce evidence of appellant's character. Rulings on evidentiary matters rest within the sound discretion of the trial court. *McGuire v. C & L Restaurant Inc.,* 346 N.W.2d 605, 615 (Minn.1984) (citations omitted); Minn.R.Evid. 104(a). Accordingly, this court will not reverse a trial court's evidentiary ruling absent a clear abuse of discretion. *State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). On appeal, the defendant has the burden of proving that the trial court abused its discretion in admitting evidence and that the defendant was thereby prejudiced. *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994) (quoting *State v. Loe-*

*bach,* 310 N.W.2d 58, 65 (Minn.1981)). Reversal is warranted when "there is any reasonable doubt the result would have been different had the evidence not been admitted." *State v. Naylor,* 474 N.W.2d 314, 318 (Minn.1991) (citations omitted).

The admissibility of character evidence is governed by Minn.R.Evid. 404(a)(1). "[T]he prosecution may not attempt to establish the bad character of the defendant until the defendant has put that character in issue by offering evidence of good character." *State v. Sharich,* 297 Minn. 19, 23, 209 N.W.2d 907, 911 (1973) (citations omitted).

 In the instant case, appellant opened the door to the character evidence on cross-examination of McDaniel, the man who first led authorities to appellant. During the cross-examination, defense counsel inquired into and elicited testimony about the character of appellant, specifically asking McDaniel: "And you thought that this shooting was out of his *character?*" (Emphasis added). At the conclusion of the cross-examination, the trial court permitted redirect examination by the prosecution regarding the appellant's character, but limited the scope of examination to "generalities."

 Appellant contends that when he cross-examined McDaniel, he was asking McDaniel about his demeanor and was only trying to show that he did not take a leadership role in the Vice Lords. We disagree. When defense counsel specifically asks whether a criminal act is out of *character* for an accused, defense counsel opens the door to the introduction of character evidence. The trial court was within its discretion when it permitted the state to engage in limited questioning to rebut the same. *See* Minn. R.Evid. 404(a)(1). Additionally, appellant's claims of prosecutorial misconduct during the same questioning of McDaniel and during closing argument are unfounded. The trial court properly permitted character testimony and the prosecutor complied with the court's order to limit the questions to generalities.

 The fourth assertion of error concerns the admission of Bowles' statement

to McDaniels as not hearsay under Minn. R.Evid. 801(d)(2)(E). Under this rule, the statements of a co-conspirator are admissible when a preponderance of the evidence demonstrates the existence of a conspiracy between the declarant and the party against whom the statement is offered and the statement was made in the course of and in furtherance of the conspiracy. *Id.* Statements made by a co-conspirator after the conspiracy terminates are generally inadmissible. *State v. Walker,* 306 Minn. 105, 114, 235 N.W.2d 810, 817 (1975), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). However, statements made during the concealment phase of a conspiracy may be admissible under the co-conspirator exemption. *United States v. Williams,* 87 F.3d 249, 253 (8th Cir.1996).

The trial court determined that a preponderance of the evidence at trial would show that Bowles and appellant conspired to conceal themselves and that they had an agreement to leave town. The trial court found the conspiracy to be corroborated by Willis' own statements acknowledging involvement and intent to leave, his actual departure and Bowles' statements that they were planning to flee. The court then permitted McDaniel to recount a telephone conversation he had with Bowles. During the conversation, McDaniel asked Bowles about the Haaf killing and Bowles replied: "We did that. Me and Ice [2] did that." Bowles then told McDaniel he had to leave town because it was "hot."

 Appellant contends Bowles' statements should not have been admitted because they were not made in furtherance of the conspiracy. We agree. Even presuming Bowles and appellant did have an agreement to conceal themselves, Bowles' statements to McDaniel were inadmissible. Although the "furtherance requirement" is broadly construed, *State v. Howard,* 324 N.W.2d 216, 223 (Minn.1982), *cert. denied,* 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983), it would be a questionable stretch to conclude that the statements made by Bowles furthered a conspiracy to conceal.[3] All Bowles did was ad-

---

2. Appellant's nickname was "Ice" or "Ice Water."

3. The state's argument that McDaniel and Bowles were in a drug-dealing business and therefore McDaniel's understanding of Bowles'

mit to McDaniel what had happened. "A statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy * * *." *United States v. Mitchell,* 31 F.3d 628, 632 (8th Cir.1994). We, therefore, conclude that the trial court committed error in admitting Bowles' statements. Yet, any error in the statement's admission does not require reversal because the appellant has failed to demonstrate prejudice. *See Steinbuch,* 514 N.W.2d at 799 (appellant has burden of demonstrating prejudice resulting from error). Appellant himself admitted his involvement in the murder and his plan to leave town in statements to police and to McDaniel. The admission of Bowles' statements was harmless beyond a reasonable doubt.

Fifth, appellant argues that his Sixth Amendment right to a fair trial and his right to Equal Protection were violated because African–Americans were underrepresented on the Hennepin County grand jury that indicted him and the jury venire from which the petit jury was chosen.

■■■■ Pursuant to the Sixth Amendment, the United States Supreme Court requires that the jury venire must reflect a fair cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 527–28, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975). However, this requirement is limited and does not guarantee a defendant a petit jury of a particular racial composition or one that mirrors the racial makeup of the community. *Id.* at 538, 95 S.Ct. at 701–02; *see also Holland v. Illinois,* 493 U.S. 474, 480, 483, 110 S.Ct. 803, 808–09, 107 L.Ed.2d 905 (1990). To establish a prima facie showing that the jury venire from which a petit jury was selected did not satisfy the fair cross-section of the community requirement, appellant must show: (1) that the group allegedly excluded is a "distinctive" group in the community; (2) that the group in question was not fairly represented in the jury venire; and (3) that the

underrepresentation was a result of a systematic exclusion of the group in question from the jury selection process. *State v. Williams,* 525 N.W.2d 538, 542 (Minn.1994) (citing *Duren v. Missouri,* 439 U.S. 357, 364–66, 99 S.Ct. 664, 668–70, 58 L.Ed.2d 579 (1979)).

On the issue of the Sixth Amendment, this court's decisions in *State v. Williams,* 525 N.W.2d at 538, and *State v. Roan,* 532 N.W.2d 563 (Minn.1995), are dispositive. In *State v. Williams,* this court stated that the key to making out a prima facie case is showing that "over a significant period of time—panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels and that this results from 'systematic exclusion,' that is, unfair or inadequate selection procedures used by the state * * *." *State v. Williams,* 525 N.W.2d at 543. Even if appellant were to show the necessary underrepresentation, as a matter of law, he could not demonstrate that the underrepresentation resulted from the state's procedures because in *Roan,* this court upheld the same Hennepin County selection process at issue here against a Sixth Amendment challenge. *Roan,* 532 N.W.2d at 569.

■■■ Appellant's Equal Protection claim concerning the jury venire also fails.[4] The appellant relies on *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), to argue that an absolute disparity of 2.10 percent[5] is sufficient to make an Equal Protection challenge. Even presuming the accuracy of the appellant's 2.10 percent absolute disparity statistic, appellant could not establish a prima facie Equal Protection claim under *Castaneda.* In *Castaneda,* the absolute disparity was 40 percent. *Id.* at 495, 97 S.Ct. at 1280. In support of its holding in *Castaneda,* the Court cited other disparities that would make a prima facie showing of discrimination, the least of which

---

need to leave town would make Bowles' and appellant's departure easier is not persuasive.

4. In his brief, appellant makes an Equal Protection challenge to the grand jury and the jury venire, but only offers statistics concerning the jury venire, so we will decide only the venire question.

5. The absolute disparity method is a statistic derived from subtracting the percentage of the venire who are a particular race from the percentage of the community who are of that race. *See State v. Williams,* 525 N.W.2d at 542.

was 14.7 percent. *Id.* at 496, 97 S.Ct. at 1281. An absolute disparity of 2.10 percent simply does not demonstrate substantial underrepresentation.

 Appellant's last claim of error is that the trial court lacked authority to order that his Minnesota sentence run consecutive to his Illinois sentence. When sentencing a person convicted of multiple counts of first-degree murder, the trial court has discretion to impose concurrent or consecutive life sentences. *Roan,* 532 N.W.2d at 573. This power to order consecutive sentences extends to the multistate context. Consecutive life sentences for first-degree murder are permissible so long as they "are commensurate with culpability and not an exaggeration of defendant's criminality." *State v. Miller,* 488 N.W.2d 235, 241 (Minn.1992) (quoting *Bangert v. State,* 282 N.W.2d 540, 547 (Minn. 1979)). In deciding whether the sentence exaggerates the defendant's criminality, the court is guided by sentences received by other offenders. *State v. Wilson,* 539 N.W.2d 241, 246 (Minn.1995). Consecutive sentences will not be overruled by this court unless there has been a clear abuse of discretion. *State v. Smith,* 541 N.W.2d 584, 590 (Minn.1996) (citation omitted).

Appellant argues that the trial court did not have authority to order consecutive sentences because Minn.Stat. § 609.15 (1996) does not grant such authority in a multistate context. While it is true that the statute applies only to Minnesota courts, *see State v. Wakefield,* 263 N.W.2d 76, 77 (Minn.1978), appellant's argument is without merit. On its face, the statute is limited to declaring what will happen in a case if a trial court fails to specify whether multiple sentences are concurrent or consecutive. *See* Minn.Stat. § 609.15. Specifically, the statute provides that if a trial court does not state whether two or more sentences are to run concurrently or consecutively, the sentences shall run concurrently. *Id.*

The only question left, then, is whether the pronounced consecutive sentences are commensurate with appellant's culpability or unfairly exaggerate the appellant's criminality. Time after time this court has affirmed consecutive sentences for multiple murders committed during one event within this state. *See Wilson,* 539 N.W.2d at 246; *see also*

*State v. Jobe,* 486 N.W.2d 407, 421, n.5 (Minn. 1992) (holding that consecutive sentences could be appropriate for appellant who stabbed two people to death, one being a 2½–year–old child); *State v. Ouk,* 516 N.W.2d 180, 186 (Minn.1994) (affirming consecutive life sentences for appellant who shot four victims at close range when it was a "mere fortuity" that two victims survived); *Bangert,* 282 N.W.2d at 547 (finding consecutive sentences proper for appellant who shot and killed two victims while they slept). There is no reason the outcome should be different here just because the killings took place in different jurisdictions. Appellant murdered a Minneapolis police officer to make a political statement and then committed a second murder in Illinois. The trial court, as supported by the record, was well within its discretion when it ordered a consecutive sentence.

For the foregoing reasons, we affirm appellant's conviction and sentence.

Affirmed.